**IN THE UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

---

| | |
|---|---|
| ATLANTIC RESEARCH MARKETING SYSTEMS, INC., | : |
| | : |
| | : |
| Plaintiff, | : |
| v. | : |
| | : |
| STEPHEN P. TROY, JR., AND TROY INDUSTRIES, INC. | : |
| | : |
| | : |
| Defendants. | : |
| | : |

Civil Action No. 07-cv-11576 (PBS)

---

## PLAINTIFF ATLANTIC RESEARCH MARKETING SYSTEMS, INC.'S PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW SUPPORTING ITS CLAIMS UNDER MASSACHUSETTS GENERAL LAWS CHAPTER 93A

Respectfully submitted,

SCOTT & BUSH LTD.

/s/ Christine K. Bush
Craig M. Scott (BBO No. 556210)
cscott@scottbushlaw.com
Christine K. Bush (BBO No. 635381)
cbush@scottbushlaw.com
Scott & Bush Ltd.
30 Kennedy Plaza, Fourth Floor
Providence, RI 02903
(401) 865-6035 - Phone
(401) 865-6039 - Fax

*Attorneys for Plaintiff Atlantic Research Marketing Systems*

## TABLE OF CONTENTS

I.      **TABLE OF AUTHORITIES** ............................................................................... ii

II.     **INTRODUCTION** ........................................................................................1

III.    **PROPOSED FINDINGS OF FACT** ..........................................................1

      A.    Atlantic Research Marketing Systems, Inc. ...............................................1

      B.    The Weapon Failures and Suspicions as to Causes ...................................2

      C.    Richard Swan Diagnosed the Failures .......................................................3

      D.    Mr. Swan Designed a Revolutionary
             Handguard to Address the Problems .........................................................3

      E.    Strategic Decisions and Additional Experimentation ...............................5

      F.    The Crane MDNS Solicitation ..................................................................6

      G.    Richard Swan Trains Stephen Troy to be His Successor ..........................7

      H.    Stephen Troy Incorporates Troy Industries ............................................11

      I.    A.R.M.S. Terminated Troy, Troy Misappropriated
           A.R.M.S.'s Trade Secrets and the Laptop so He Could
           "Run With" Troy Industries .....................................................................11

      J.    Defendants Intentionally Interfered with Discovery
           to Impede Efforts to Determine the Volume of
           Defendants' Sales of the MRF Product ...................................................14

      K.    Defendants' Acts Harmed A.R.M.S. ......................................................16

IV.    **CONTROLLING AUTHORITIES** ..................................................................19

V.     **PROPOSED FINDINGS OF LAW** ................................................................20

      A.    Defendants Violated Massachusetts Unfair Trade Practices Law ..........20

      B.    Defendants' Conduct Was Willfully and/or Knowingly Unfair .............21

      C.    Defendants' Conduct Caused Injury .......................................................22

VI.    **CONCLUSION** ........................................................................................23

## I.    TABLE OF AUTHORITIES

*Anderson v. Comcast Corp.*, 500 F.3d 66 (1st Cir. 2007) .............................................23

*Anthony's Pier Four, Inc. v. HBC Assocs.*, 583 N.E.2d 806 (1991) ...........................20, 22

*DiMarzo v. American Mut. Ins. Co.*, 449 N.E.2d 1189 (Mass. 1983) ...........................22

*Ecological Fibers, Inc. v. Kappa Graphic Bd. B.V.*,
    345 F.Supp.2d 13 (D. Mass. 2004) .....................................................................20

*Incase, Inc. v. Timex Corp.*, 421 F.Supp.2d 226 (D. Mass. 2006)..................................19

*Industrial General Corp. v. Sequoia Pacific Systems Corp.*,
    44 F.3d 40 (1st Cir. 1995).......................................................................................21

*Jet Line Services, Inc. v. American Employers Ins. Co.*,
    537 N.E.2d 107 (Mass. 1989) ...............................................................................23

*Jillian's Billiard Club of Am., Inc. v. Beloff Billiards, Inc.*
    619 N.E.2d 635 (Mass. App. Ct. 1993) ...........................................................20, 21

*Katter v. Demoulas*, 739 N.E.2d 246 (Mass. 2000).......................................................19

*Maillet v. ATF-Davidson Co.*, 407 Mass. 185, 552 N.E.2d 95 (1990) ...........................23

*Massachusetts Eye and Ear Infirmary v. QLT Phototherapeutics, Inc.*,
    412 F.3d 215 (1st Cir. 2005) ...........................................................................19, 21

*Milliken & Co. v. Duro Textiles, LLC*, 887 N.E.2d 244 (Mass. 2008) ...........................19

*Mill Pond Assoc. v. E&B Giftware*, 751 F. Supp. 299 (D. Mass. 1990)........................23

*Peggy Lawton Kitchens, inc. v. Hogan*,
    466 N.E.2d 138 (Mass. App. Ct. 1984) ...............................................................21

*PMP Assocs., Inc. v. Globe Newspaper Co.*, 321 N.E.2d 915 (1975) ...........................21

*Professional Services Group, Inc. v. Town of Rockland*, 515 F.Supp.2d 179
    (D. Mass. 2007) ...................................................................................................20

## II.    INTRODUCTION

In Count V of the Complaint, Plaintiff Atlantic Research Marketing Systems, Inc.

("A.R.M.S.") alleges that Defendants Stephen P. Troy and Troy Industries, Inc. (collectively

"Troy") knowingly and willfully committed unfair methods of competition and deceptive acts or

practices in trade or commerce in violation of Massachusetts General Law ch. 93A, § 11.

After a two week trial, a jury found Troy liable for misappropriation of trade secrets and

breach of fiduciary duty and entered a verdict in favor of A.R.M.S. for more than $1.8 million.

This Court reserved judgment on A.R.M.S.'s Chapter 93A claims.

For the reasons set forth below, the Court should find in favor of A.R.M.S. on its Chapter

93A claims against Defendants.

## III.    PROPOSED FINDINGS OF FACT

### A.    Atlantic Research Marketing Systems, Inc.

1.    A.R.M.S. is a family owned business founded in 1980.  (Trial Transcript Day 1, "Day 1," 64.)

2.    Richard Swan, a co- founder of A.R.M.S., began working with small arms in 1967, when he joined Colt Manufacturing to test and evaluate various weapons, including the M16 rifle.  (Day 1, 67.)

3.    A.R.M.S. makes accessories for small arms weaponry.  It also makes and designs products for anti-armor systems, helicopter gunships, and fast boats.  (Day 1, 65.)  Mr. Swan holds 24 issued patents and numerous patent applications in small arms weapons accessories.  (Day 1, 66.)

4.    A.R.M.S. currently offers for sale approximately sixty (60) products, including, mounts, handguards, brackets, interface systems, and iron sights.  (Day 1, 65.)

5.      A.R.M.S.'s customers include different branches of the United States military, law enforcement, foreign allies, and the commercial market.  (Day 1, 66.)

6.      From 1999 through 2003, A.R.M.S. took measures to prevent unwanted access to its facilities and proprietary business information: the facilities had an alarm system linked directly to the police station, there were cameras to monitor the front door, doors were locked, visitors were required to sign a log book before entering areas where proprietary information was kept, and individuals were required to sign nondisclosure agreements before being provided access to proprietary information.  (Day 1, 69, 89; Exhs. 5, 10, 38, 58.)

**B.      The Weapon Failures and Suspicions as to Causes.**

7.      In the 1990s, military personnel were experiencing problems with the M4 family of weapons (i.e., the M4, M16 and AR14).  The upper receiver on those weapons is aluminum, and the barrel, which is secured in the upper receiver, is steel.  (Trial Transcript Day 3, "Day 3," 129.)  When the weapon is in use ("cycled"), the lugs on the bolt lock and the round fires.  Then, gas causes the lugs to unlock, and the spent round is extracted.  (Day 3, 126.)  Military personnel were discovering that the locking lugs were breaking off, which prevented the weapon from firing, a potentially catastrophic failure.  (Day 3, 126.)  They also discovered that the barrel was coming loose where it connected to the upper receiver.  (Day 3, 128.)

8.      There was suspicion that this problem was caused by heat and the standard-issue handguards.  (Day 3, 129-30.)  At that time, the standard-issue handguards were drop-in products that went inside the barrel cap on the front of the weapon and were secured into place by the spring-loaded delta ring.  (Day 3, 133-34.)  Those standard issue handguards were plastic or aluminum, both of which trapped heat.  (Day 1, 82.)

9.      With rapid firing, the steel barrel can heat to over 900 degrees, so when

the bolt pounded into the backend of the barrel, the heat of the steel barrel was re-forging the aluminum receiver, causing the receiver to re-shape into an oval and the barrel to loosen.  (Day 3, 24-25, 128.)

10.     Additionally, military personnel were hanging accessories and grips from the standard-issue handguards that attached onto the barrel of the weapon, so the weight of the accessories and soldiers pulling on the grips appeared to be pulling the barrel downward.  (Day 3, 24-25.)

### C.     Richard Swan Diagnosed the Failures.

11.     Richard Swan became aware of the issues, investigated the problem, and reported his concerns about the overheating failures associated with the M16/M4 weapons to Major General Carl Ernst, Commanding General, U.S. Army Infantry Center and Fort Benning. Richard Swan also proposed solutions for those problems in a report that he prepared at the request of Maj. Gen. Ernst.  (Day 1, 85-86; Exh. 75.)

12.     In December 1998, Richard Swan also reported his overheating concerns and solutions to Sergeant Major Martin Barreras, a Force Modernization Officer for the Second Ranger Battalion of the United States Army.  (Day 1, 88; Day 2, 13.)  As Force Modernization Officer, Sgt. Major Barreras was responsible for researching and evaluating enhancements for equipment for soldiers.  (Day 3, 122.)

### D.     Mr. Swan Designed a Revolutionary Handguard to Address the Problems.

13.     In December 1998, Sgt. Major Barreras visited the A.R.M.S. facility in Massachusetts.  During that visit, Mr. Swan and Sgt. Major Barreras discussed the M4 malfunctions.  Mr. Swan showed Mr. Barreras his 1996 Ernst report concerning the weapons failures and his proposed solutions to those failures.  (Trial Transcript Day 2, "Day 2," 12.)

14.     During that meeting, Mr. Swan also showed Sgt. Major Barreras the
A.R.M.S. Rigid Frame handguard that Mr. Swan had designed from 1989 through 1991.  (Day 1,
81; Day 3, 140.)  The A.R.M.S. Rigid Frame handguard was a free float handguard, i.e. it
attached to the weapon but allowed the barrel to float without pressure on the barrel.  It also
stopped the conduction of heat from the barrel.  (Day 1, 81-82; Exh. 1.)

15.     Sgt. Major Barreras examined the Rigid Frame product and studied Mr.
Swan's report to Major General Enrst.  (Day 3, 141-42.)  They set a time to meet again to discuss
the failures.  (Day 2, 13.)  Sgt. Major Barreras understood that his discussions with Mr. Swan
were to be treated as confidential and proprietary.  (Day 3, 138.)

16.     Mr. Swan and Sgt. Major Barreras met again on January 20, 1999.  (Day
3, 142-43.)  During that meeting, they went into the basement of the A.R.M.S. facility where Mr.
Swan maintains a Bridgeport machine used to machine prototypes.  There, in the presence of Sgt.
Major Barreras, Mr. Swan machined a proof of concept handguard that used a clamp to attach
solely to the barrel nut of the M4 for support (the "1999 Proof of Concept").  (Day 2, 14, 79; Day
3, 144-146.)

17.     To do that, Mr. Swan started with an existing standard-issue aluminum
drop-in handguard manufactured by Knights Armament.  (Exh. 4; Day 2, 14-15.)

18.     Mr. Swan machined aluminum from the rearward end and machined
notches so the piece would fit down on top of the tines of the barrel nut after the delta ring had
been removed from the weapon.  (Exh. 3, Day 2, 15.)  Removing the delta ring allowed Mr.
Swan to eliminate the void where the delta ring was before removal, bring the handguard back so
it was in alignment with the top of the receiver and create one continuous level plane for
attachment of various devices.  (Day 2, 17; Day 3, 146-47.)

19.     As a result of Mr. Swan's machining, the handguard positioned up against the front of the receiver and sat right on top of the barrel nut.  (Day 3, 147.)

20.     Sgt. Major Barreras then watched as Mr. Swan machined a clamp from a block of aluminum.  At Mr. Swan's request, Frank Basile, A.R.M.S.'s machinist, had sent Mr. Swan the block of aluminum in advance of Sgt. Major Barreras's visit.  (Day 2, 18; Day 3, 101.)

21.     Mr. Swan took the square piece of aluminum with a hole in it and found the center line.  He made a mark, put it on the band saw, pushed it through and cut the piece, like cutting a doughnut in half.  The clamp piece fit around the bottom of the barrel nut.  (Exh. 15; Day 2, 18-19; Day 3, 148-49.)

22.     After he machined the clamp, Mr. Swan drilled two holes on either side of the clamp and matching holes in the upper handguard piece for screws to fasten the handguard to the clamp.  (Day 2, 21-22.)

23.     Mr. Swan then produced a lower handguard for the handguard product that snapped into place.  (Day 2, 23-24.)

24.     The finished handguard product free floated (i.e. did not touch) the barrel of a M4 weapon and clamped solely to the barrel nut for support after the delta ring was removed.  (Day 2, 23.)

**E.     Strategic Decisions and Additional Experimentation.**

25.     A.R.M.S. did not bring the 1999 Proof of Concept directly to market because the United States military did not have a consensus that expressly allowed permanent removal of the delta ring.  (Day 2, 27, 40-41; Day 3, 30.)

26.     Specifically, Mr. Swan understood that the Army did not want the delta ring removed from weapons because the part has to be cut off or the barrel removed to take off

the delta ring, which is a significant modification; if the delta ring remains intact, the weapons could more easily be returned to their original condition after all accessories had been removed. (Day 3, 27-30.)

27.     So in 1999 and 2000, Mr. Swan began extensive experimentation with a variety of upper and lower handguard prototypes in various materials and configurations.  (Day 2, 30-38; Day 3, 102-103, 117; Exhs. 16, 17, 19, 20, 21, 22, 23, 24, 25, 26, 28, 29, 43.)

28.     A.R.M.S.'s machinist spent thousands of hours on the confidential prototype work using sketches and direction from Mr. Swan.  (Day 3, 102-03.)  Some of the products included interrupted lugs that Mr. Swan developed with Frank Basile.  (Day 2, 34-37.)

**F.     The Crane MDNS Solicitation.**

29.     Lucius Taylor, program manager at Crane Naval Surface Warfare Center ("Crane"), also had conversations with Mr. Swan concerning the weapons failures.  (Day 3, 25.) Those conversations included confidential information, including Mr. Swan's disclosure to Mr. Taylor of his free float handguard design on a weapon with the delta ring removed.  (Day 3, 27.)

30.     Richard Swan was one of several members of industry to attend pre-solicitation conferences organized by Special Operations Command ("SOCOM") in 1999 and 2000 to address failures with the M4 rifle.  (Day 3, 21-23.)  In addition to public discussions, Mr. Swan participated in private closed sessions concerning the M4 failures.  (Day 3, 23-24.)

31.     In 2003, A.R.M.S. prepared and submitted a detailed response to a request for proposal concerning weapons handguards issued by Crane in connection with the Miniature Day Night Sight ("MDNS") Program.  (Day 2, 42.)  A.R.M.S.'s initial response did not include the Proof of Concept handguard because the solicitation did not allow attaching the handguard solely to the barrel nut, which was the mechanism used by the 1999 Proof of Concept.  (Day 2,

6

42-43; Day 3, 152.)

32.     Instead, A.R.M.S. submitted its bi-level handguard system that attaches to the top of the receiver and, also, includes a clamp that allows the handguard to attach to the barrel nut both with and without the delta ring in place.  (Day 2, 43.)

33.     A.R.M.S.'s initial solicitation response was rejected.  A.R.M.S. appealed the rejection to the General Accounting Office ("GAO"), prevailed, and resubmitted a new response to the request for proposal that included the 1999 Proof of Concept handguard that clamped solely to the barrel nut.  (Day 2, 45-48.)  Ultimately, Crane issued a $16 million contract to A.R.M.S. for its M-CV handguard products.  (Exh. 68.)

34.     The A.R.M.S. M-CV products include an upper handguard, a lower handguard and a clamp.  (Day 3, 104-106; Exhs. 31, 32, 33, 67.)  The A.R.M.S. M-CV handguard products all clamp to the barrel nut.  (Trial Transcript Day 4, "Day 4," 43-45.)

35.     Bay State Machine began machining the A.R.M.S. M-CV handguards for production in 2004 (Day 3, 113), and A.R.M.S. sold its first M-CV product to Crane in 2005. (Day 2, 50-52.)

**G.     Richard Swan Trains Stephen Troy to be His Successor.**

36.     Mr. Swan first met Stephen Troy in 2002, when Mr. Troy was a customer of A.R.M.S. (Day 2, 52.)

37.     At that time, Mr. Troy had started Basher Tactical, which he explained to Mr. Swan was a start-up business for training law enforcement.  Mr. Troy asked to be an A.R.M.S. distributor.  (Day 2, 52.)

38.     Mr. Troy was enthusiastic about A.R.M.S.'s products and thought it would benefit him to work for A.R.M.S.  (Trial Transcript Day 6, "Day 6," 24.)  Mr. Troy understood

that Mr. Swan was known in the industry as an inventor of small arms weapons accessories products and that A.R.M.S. was a first-to-market company for those accessories.  (Day 6, 25-26.)

39.     A.R.M.S. allowed Mr. Troy to be a distributor after he signed a Distributor Agreement.  (Day 2, 52; Exh. 53.)

40.     The Distributor Agreement contains a confidentiality provision, and Mr. Troy acknowledged that it is important for companies to protect their confidential information. (Day 6, 22.)

41.     Shortly thereafter, Mr. Swan and Mr. Troy began discussing a change to the arrangement.  Mr. Troy was very interested in A.R.M.S. and told Mr. Swan he wanted to become part of A.R.M.S.'s business.  Eventually, A.R.M.S. hired Mr. Troy as a full time employee.  (Day 2, 54.)

42.     Before beginning work as an employee, Mr. Troy signed a nondisclosure agreement.  (Day 2, 55; Day 6, 26-27; Exh. 54.)

43.     Mr. Troy knew that Mr. Swan was concerned about confidentiality and he felt obligated to maintain the confidentiality of the information he learned from A.R.M.S.  (Day 6, 27.)

44.     Mr. Troy sat next to Mr. Swan,[1] and Mr. Swan brought him into the inner sanctum of the company and started to teach him everything about A.R.M.S.  (Day 2, 54.)  Mr. Troy became like a family member to the Swans, and Mr. Swan sent him out to customers, vendors, and machine shops as Mr. Swan's right-hand man.  (Day 2, 55.)

45.     Mr. Swan taught Mr. Troy every part of A.R.M.S.'s business so Mr. Troy could answer technical questions and train A.R.M.S. distributors.  (Day 2, 56.)  Among other

---

[1] Brian Fraser-Swan, who joined A.R.M.S. as an employee in 2003 shortly after Mr. Troy was terminated, sat at Mr. Troy's desk right next to Richard Swan.  (Day 4, 39; Exh. 83.)

things, Mr. Swan familiarized Mr. Troy with A.R.M.S.'s computer programs and equipment,

including the Bridgeport machine in the basement.  (Day 2, 57.)

46.     One of Mr. Troy's responsibilities at A.R.M.S. was new product

development.  (Day 6, 27-29.)  When Mr. Troy became an employee, the 1999 Proof of Concept

and the dozens of other 1999/2000 prototypes were already in existence.  (Day 2, 56.)  During

Mr. Troy's first week of work, Mr. Swan revealed the proofs of concept for each A.R.M.S.

product to Mr. Troy, including the 1999 Proof of Concept.  (Day 2, 56-57, 81-82.)

47.     Since the handguards, in particular, had a long history of development

going back to 1996, Mr. Swan explained the weapons failures and demonstrated for Mr. Troy

how A.R.M.S. initially clamped the handguard solely to the barrel nut, then developed the next

generation of bi-level handguard so the product also attached to the top of the receiver per

military requirements.  (Day 2, 56-57; Day 3, 91-92.)  It was important for Mr. Troy to learn the

history of the A.R.M.S.'s handguard development so he could represent A.R.M.S. in the industry

understanding the reasoning behind the handguards' development progress.  (Day 2, 57.)

48.     When Mr. Swan showed Mr. Troy the 1999 Proof of Concept, Mr. Troy

acknowledged the benefit of clamping to the barrel nut, and Mr. Swan explained why A.R.M.S.

could not bring it to market immediately.  (Day 2, 58.)

49.     Mr. Troy's desk was approximately eight (8) feet from where A.R.M.S.

stored the prototypes and proofs of concept.[2]  (Day 2, 61.)

50.     Mr. Swan cautioned Mr. Troy that all A.R.M.S. business and development

---

[2] Mr. Fraser Swan, who took over the desk, was directly across from the bookshelf holding the handguard prototypes and proof of concept (Day 4, 40-41) and could listen in on phone calls Mr. Swan made to customers on technical issues.  (Day 4, 35.)

information was confidential and proprietary to A.R.M.S.[3]  (Day 2, 58; Day 3, 82.)  Mr. Troy

acknowledged that his discussions with Mr. Swan were confidential.  (Day 4, 29.)

51.     Mr. Troy understood that Mr. Swan trusted him, and they discussed that

Mr. Swan was training Mr. Troy as his successor at A.R.M.S.  (Day 6, 29-30.)

52.     Mr. Swan also introduced Mr. Troy to A.R.M.S.'s machinist.  (Day 2, 60.)

In the fifteen years Bay State Machine has been A.R.M.S.'s machinist, Mr. Troy was the only

person Mr. Swan brought to the facility to learn A.R.M.S.'s manufacturing process other than

Mr. Swan's future son-in-law.[4]  (Day 3, 107.)

53.     Mr. Swan taught Mr. Troy A.R.M.S.'s design and manufacturing

processes, including the extrusion process, and gave him access to A.R.M.S.'s trade secrets and

proprietary information.  (Day 2, 54, 115; Day 3, 87-91.)

54.     Mr. Swan also sent Mr. Troy on trips in his stead as A.R.M.S.'s

representative to, among others, Armalite, Bushmaster, Colt and Crane.  (Day 2, 59-60; Day 6,

30.)  A.R.M.S. paid for those trips and trusted Mr. Troy to act as its representative.  (Day 6, 30.)

55.     Mr. Troy also represented A.R.M.S. at industry shows, including the 2003

AUSA Show, as Vice-President of A.R.M.S.  (Day 6, 20.)

56.     A.R.M.S. provided Mr. Troy with a new laptop computer (the "Laptop")

for his use as an A.R.M.S. employee.  (Day 6, 31.)  A.R.M.S. paid to upgrade the Laptop in

preparation for its response to the Crane MDNS contract work.  (Day 6, 32-33; Exh. 55.)

---

[3] Mr. Swan also trained Mr. Fraser-Swan and showed him handguard prototypes and developmental designs, including the 1999 Proof of Concept. (Day 4, 35-36.)  Like he did with Mr. Troy, Mr. Swan repeatedly told Mr. Fraser-Swan that the products and prototypes were confidential and proprietary.  (Day 4, 37, 51.)

[4] Mr. Fraser-Swan confirmed that Mr. Swan took him to Bay State Machine and introduced him to Frank Basile so he could understand how A.R.M.S. products are machined and assembled.  (Day 4, 38.)

**H.     Stephen Troy Incorporates Troy Industries.**

57.     While still employed at A.R.M.S., Stephen Troy incorporated defendant Troy Industries, Inc. in January 2003.  (Trial Transcript Day 5, "Day 5," 72-73; <u>Exh. 69</u>.)  Mr. Troy never told Mr. Swan that he was forming Troy Industries to compete with A.R.M.S., nor did Mr. Troy tell Mr. Swan that he was forming Troy Industries to sell handguard products. (Day 6, 34.)

58.     In early 2003, Troy Industries was a start up business that Mr. Troy and his wife operated out of a spare bathroom in their home.  (Day 6, 33-34.)

59.     In February 2003, Mr. Troy accompanied Mr. Swan and A.R.M.S. to the SHOT Show, a large industry show.  (Day 2, 63.)  At that show, Mr. Swan encouraged Mr. Troy to promote a modified M14 weapon (the "SOPMOD M14") that Troy Industries had been working on, since that product did not compete with any A.R.M.S. products.  (Day 5, 63-67; <u>Exh. 60</u>.)

60.     Troy Industries was not competing with A.R.M.S. at the 2003 SHOT Show.  (Day 5, 93-94.)

**I.     A.R.M.S. Terminated Troy, Troy Misappropriated A.R.M.S.'s Trade Secrets and the Laptop so He Could "Run With" Troy Industries.**

61.     At the 2003 SHOT Mr. Swan first learned that Mr. Troy had registered to have his own booth for Troy Industries at the 2004 SHOT Show.  (Day 2, 63; Day 6, 35.)

62.     A.R.M.S. terminated Mr. Troy by letter dated Friday, February 28, 2003. (Day 2, 64; <u>Exh. 59</u>.)  Mr. Troy testified that he did not receive the letter until Monday, March 3, 2003.  (Day 6, 37.)

63.     The notice of termination, among other things, demanded that Mr. Troy return the Laptop he had been using for A.R.M.S.'s business.  (<u>Exh. 59</u>.)  Mr. Troy failed to do

so.  (Day 2, 65, 105-06.)

64.     Mr. Troy tried to explain the delay in returning the Laptop by telling A.R.M.S. that "I had valuable information stored that had to be retrieved prior to shipping." (Day 6, 36.)

65.     Mr. Troy also warned A.R.M.S. that "Myself and my family were lied to by Dick, and that would have had grave consequences had I not taken steps to protect us."  (Day 6, 36.)

66.     A forensic consultant examined the Laptop and determined that all information had been intentionally deleted.  (Day 2, 65, 105-06.)

67.     By the beginning of March 2003, Mr. Troy had been fired from A.R.M.S., Troy Industries was operating out of his spare bathroom, and Troy Industries had only the SOPMOD M14 rifle to offer for sale, which was not selling in any measurable quantities.  (Day 6, 37.)

68.     That is when Mr. Troy decided to "run with" Troy Industries.  (Day 6, 37.) He knew about the Crane MDNS solicitation for handguards, he knew A.R.M.S. had been working on a response to the solicitation, he had some insight into what Crane wanted for a response based on the trip he took to Crane for A.R.M.S., and he had the A.R.M.S. Laptop.  (Day 6, 38.)

69.     So, days after he was terminated, Mr. Troy contacted Crane, a customer of A.R.M.S., and offered a handguard system.  (Day 2, 66; Day 3, 34-35.)  Mr. Troy also contacted A.R.M.S.'s machinist Frank Basile of Bay State Machine to ask whether Mr. Basile would work with him.  (Day 2, 66-67.)  Mr. Basile declined.  (Day 3, 108.)

70.     Defendants prepared a response to the Crane MDNS solicitation dated

March 5, 2003, two days after Mr. Troy says he received the termination letter.  (Day 6, 38-39; Exh. 62.)

71.     Notwithstanding the fact that Mr. Troy conceded he had never designed a handguard product prior to being fired by A.R.M.S. (Day 6, 20-21), Defendants' response to the Crane MDNS solicitation proposed a handguard that free floated off the barrel of the M4 weapon.  (Day 5, 98-99; Day 6, 40; Exh. 62.)

72.     The configuration of the product described in the March 3 proposal was too expensive for Defendants to produce.  (Day 6, 41.)  According to Mr. Troy, it was simply too expensive to do the research and development for a new handguard.  (Day 4, 101-02.)

73.     Mr. Troy went on vacation to Turkey.  (Day 6, 41.)

74.     Mr. Troy now implausibly claims that while on that vacation, he came up with the idea for a novel handguard.  Mr. Troy suggests that he decided to remove the delta ring and then designed an extruded handguard with a removable lower handguard piece and a clamp with four screws that clamps solely to the barrel nut of the M4 weapon.  (Day 5, 108-09, 112-13; Day 6, 43.)

75.     Following Mr. Swan's lead, Mr. Troy used a Knights Armament handguard as the starting point for his "new" handguard design.  (Day 6, 45-46; Exh. 167.)

76.     Mr. Troy also initially proposed using a lower handguard made of plastic, the material that A.R.M.S. used in the prototypes to which Mr. Troy was exposed while at A.R.M.S.  (Day 6, 49-50; Exh. 167.)

77.     Thereafter, Stephen Troy and Troy Industries manufactured, offered for sale and sold a handguard, called the Modular Rail Forend ("MRF") (Exh. 70) in a variety of lengths that clamp solely to the barrel nut and incorporate A.R.M.S.'s trade secrets and

proprietary information, including the 1999 Proof of Concept.  (Day 2, 70; Day 3, 90-91.)

78.     Troy Industries first offered its MRF handguard for sale at the 2004 SHOT

Show.  (Day 5, 120.)

79.     The Troy MRF is an extruded product.  It includes an upper handguard, a

lower handguard and a clamp.  (Exh. 70.)  It clamps solely to the barrel nut for support, which

Mr. Troy learned from the 1999 Proof of Concept.  (Day 2, 71, 77; Day 5, 128-31, 147.)  The

Troy MRF also uses a clamp with four holes and a detachable lower handguard piece with

interrupted lugs, all taken from the 1999 Proof of Concept.  (Day 2, 71, 77.)

80.     Mr. Troy later applied for a patent to cover the MRF product, falsely

claiming that he invented the novel concept of a handguard that clamps solely to the barrel nut.

(Exh. 201.)

> **J.**     **Defendants Intentionally Interfered with Discovery to Impede Efforts to Determine the Volume of Defendants' Sales of the MRF Product.**

81.     Defendants began selling the MRF handguards in 2004.  (Exh. 71.)

82.     The incomplete information produced by Defendants in discovery

suggested that Defendants sold only 235 MRF products in 2004.  (Day 4, 73.)

83.     Defendants produced no information concerning sales between January 1,

2005 through February 18, 2005.  (Day 4, 72.)  Defendants characterized this as a "gap in sales"

but provided no explanation for that gap.  (Day 4, 73.)

84.     The incomplete information produced by Defendants in discovery

suggested that Defendants sold only 307 MRF products from February 18, 2005 through the end

of May 2005.  (Day 4, 73.)

85.     The incomplete information produced by Defendants in discovery

suggested that Defendants sold only 1,145 MRF products from mid-June 2005 through

December 31, 2006.  (Day 4, 71; Exh. 71.)

86.     Defendants produced ten pages of partially redacted sales information for the period June 2005 through December 31, 2006 that allegedly was derived from Troy Industries' accounting software.  (Day 4, 69-70; Day 6, 61; Exh. 71.)

87.     During discovery, however, Defendants produced no information concerning sales of MRF products to Smith & Wesson.  (Exh. 71.)   Nor did Defendants produce products manufactured for or sold to Smith & Wesson.  (Day 6, 53-55.)

88.     Immediately prior to trial, Plaintiff confirmed that Troy Industries had an original equipment manufacturer ("OEM") relationship with Smith & Wesson in 2005 and 2006.  (Day 4, 75; Day 6, 58; Exh. 89.)

89.     Through that relationship, Troy Industries manufactured and sold its MRF handguard product to Smith & Wesson.  (Day 4, 75.)

90.     Troy Industries' OEM sales of MRF products to Smith & Wesson were by far the majority of Troy Industries' sales in 2005 and 2006.  (Day 6, 58-59.)

91.     Smith & Wesson produced documents pursuant to a pretrial subpoena that showed that Troy Industries sold Smith &Wesson 9,523 MRF handguards prior to December 31, 2006.  (Day 4, 94-95; Day 6, 64; Exh. 89.)

92.     Troy Industries did not introduce any evidence to prove that it did not deliver all 9,523 MRF handguards prior to December 31, 2006.  In fact, Defendants introduced no records concerning any sales to Smith & Wesson.

93.     At trial Defendants suggested that products sold to Smith & Wesson are not comparable to A.R.M.S. products.  That suggestion, raised for the first time at trial, was an effort to rebut damages.  (Day 6, 55.)

94.     Defendants also introduced a misleading animation to the jury contrasting the Troy MRF with A.R.M.S. products that Defendants concede are not the comparable products at issue in this litigation.  (Day 6, 66-69.)

95.     Defendants also interfered with a trial subpoena issued to Leed Himmel intended to verify the damage information Defendants produced.  (Day 5, 8-11.)

**K.     Defendants' Acts Harmed A.R.M.S.**

96.     Defendants' misappropriation and use of A.R.M.S.'s trade secrets and proprietary information harmed A.R.M.S.  Among other things, A.R.M.S. lost its first to market opportunity, A.R.M.S. was deprived of sales, and Defendants wrongfully benefitted from sales of products incorporating A.R.M.S.'s trade secrets.  (Day 2, 72.)  In effect, A.R.M.S. was forced to compete with its own trade secret.

97.     All parties agree that Troy MRF products compete with the A.R.M.S. M-CV products and are used on the same weapons.  (Day 4, 47, Day 5, 149-52.)  Mr. Troy conceded that the MRF and M-CV products fit the same weapon and clamp to the barrel nut. (Day 5, 150.)

98.     The A.R.M.S. 50M-CV is a handguard product comparable to Defendants' 7 inch MRF product.  (Day 4, 46.)

99.     The A.R.M.S. 50M-CV is a handguard product comparable to Defendants' 9 inch MRF-M.  (Day 4, 46-47.)

100.    The A.R.M.S. 50M-CV is a handguard product comparable to Defendants' 10 inch MRF-M.  (Day 4, 47.)

101.    The A.R.M.S. 58 M-CV MOD is a handguard product comparable to Defendants' 12 inch MRF-CX.  (Day 4, 47, 64.)

16

102.     Plaintiff's expert, Catherine Parente, used standard methodology for computing disgorgement damages for A.R.M.S., namely determining the profits earned by Defendants on sales of the MRF products from 2004 through December 31, 2006.  (Day 4, 92.) To do that analysis, she multiplied the number of MRF products sold by $200, which represented Defendants' net profits on each MRF sale.  (Day 4, 98-99.)  That $200 was based on Mr. Troy's prior sworn testimony concerning Troy Industries' average net profits on retail and wholesale sales of MRF products during the same period.  (Day 4, 96-97, 121-22.)

103.     Specifically, in a prior proceeding, Mr. Troy testified concerning Troy Industries' net profits on its MRF products in 2004-2006, that "on the retail level of it, it's approximately $200.  We averaged the wholesale prices to be fair with what our wholesale – we sell mostly wholesale to distributors, dealers, military units."  (Day 6, 18, 63; Ex. 255.)

104.     Despite suggesting in this trial that the $200 might somehow have been an error, Mr. Troy admitted that he never went back and clarified his testimony or asked his attorney to correct the record in the prior proceeding.  (Day 6, 66.)  To the contrary, Defendants relied on and advanced the $200 net profit per unit sales of the MRF products in the prior proceeding.

105.     With respect to disgorgement damages, Ms. Parente testified to a reasonably degree of accounting certainty that Defendants earned net profits of $337,400 on the sales of 1,687 MRF handguards to customers other than Smith & Wesson during the pertinent period.  (Day 4, 93.)

106.     With respect to disgorgement damages, Ms. Parente testified to a reasonably degree of accounting certainty that Defendants earned net profits of $1,904,600 on the 9,523 MRF handguards sold to Smith & Wesson.  (Day 4, 95.)

107.    A.R.M.S. introduced evidence that its total disgorgement damages on Defendants' sales of all MRF products between January 1, 2004 and December 31, 2006 are $2,242,000.  (Day 4, 95.)

108.    Ms. Parente also testified to a reasonably degree of accounting certainty that A.R.M.S.'s lost profits for Defendants' sales of MRF products.  To do that calculation, Ms. Parente reviewed information provided by Defendants concerning the number of MRFs sold, established the A.R.M.S. comparable product that A.R.M.S. would have sold, assigned prices to those sales, subtracted costs based on information produced by A.R.M.S. and arrived at a lost profits number for A.R.M.S.  (Day 4, 99-103.)

109.    According to Ms. Parente, to a reasonably degree of accounting certainty, A.R.M.S.'s lost profits for Defendants' sales of MRF products to customers other than Smith & Wesson units were $145,721.  (Day 4, 103.)

110.    Ms. Parente further testified to a reasonably degree of accounting certainty that A.R.M.S.'s lost profits for Defendants' sales of MRF products to Smith & Wesson were $268,739. (Day 4, 104-05.)

111.    Defendants did not offer a damages expert.

112.    In fact, Mr. Troy, Defendants' sole witness, testified that he is not involved in the accounting side of Troy Industries.  (Day 6, 16.)  Mr. Troy could not identify specific costs associated with the manufacture of the MRF products for any given period, nor could he testify competently concerning the basis for those purported costs.  (Day 6, 17.)

113.    On June 26, 2009, the jury returned a verdict in favor of A.R.M.S. Specifically, the jury found that Defendants misappropriated A.R.M.S.'s trade secrets or confidential and proprietary information and, additionally, that Stephen P. Troy, Jr. breached his

fiduciary duty to A.R.M.S.  The jury awarded A.R.M.S. $1,813,465.

## IV.    CONTROLLING AUTHORITIES

Under chapter 93A, "unfair or deceptive acts or practices in the conduct of any trade or

commerce" are unlawful. M.G.L. ch. 93A, § 2(a). The First Circuit has explained that, in

determining whether a practice violates chapter 93A, the fact finder must look to "(1) whether

the practice ... is within at least the penumbra of some common-law, statutory, or other

established concept of unfairness; (2) whether it is immoral, unethical, oppressive, or

unscrupulous; [and] (3) whether it causes substantial injury to consumers (or competitors or

other businessmen)." *Massachusetts Eye and Ear Infirmary v. QLT Phototherapeutics, Inc.*, 412

F.3d 215, 243 (1st Cir. 2005) (quoting *PMP Assocs., Inc. v. Globe Newspaper Co.*, 366 Mass.

593, 596, 321 N.E.2d 915 (1975)).

To prove such a claim, A.R.M.S. does not need to show that a particular act or practice

violate common or statutory law.  *Kattar v. Demoulas*, 433 Mass. 1, 739 N.E.2d 246, 257

(2000)(to violate Chapter 93A, acts need not violate common law or statutory law).  Because

"[t]here is no limit to human inventiveness in this field," Massachusetts courts evaluate unfair

and deceptive trade practice claims based on the circumstances of each case.  *Id.* at 257 (citations

omitted).  In so doing, Massachusetts leaves the determination of what constitutes an unfair trade

practice to the finder of fact, subject to the Court's performance of a legal gate-keeping function.

*Milliken & Co. v. Duro Textiles, LLC*, 451 Mass. 547, 887 N.E.2d 244, 259 (2008).

A claim for misappropriation of trade secrets, in violation of a non-disclosure agreement

and in an attempt to do business with a third party, can support a claim under Chapter 93A.  *See*

*Incase, Inc. v. Timex Corp.*, 421 F. Supp.2d 226, 240 (D. Mass. 2006) (citing *Mass. Eye & Ear*

*Infirmary*, 412 F.3d at 229, 238, 242-43) (jury could find that defendant violated chapter 93A by

disclosing plaintiff's confidential information to a third party in an attempt to do business with the third party); *Jillian's Billiard Club of Am., Inc. v. Beloff Billiards, Inc.*, 619 N.E.2d 635 (Mass. App. Ct. 1993) (defendant violated chapter 93A by using trade secret consisting of plaintiff's financial information to establish competing billiard parlor).  Specifically,

> a party who breaches a contract in deliberate attempt to obtain the benefits of the contract, and to avoid fulfilling its own obligations under it, may have committed an unfair or deceptive act under chapter 93A.

*Incase,* 421 F. Supp.2d at 239; *see also Ecological Fibers, Inc. v. Kappa Graphic Bd. B.V.*, 345 F. Supp.2d 13, 15-16 (D. Mass. 2004) (plaintiff stated 93A claim where defendant entered into an agreement and never intended to carry out the terms of the agreement for the full five-year term, but rather entered into it for the purpose of obtaining information about and soliciting plaintiff's customers).

An unfair or deceptive act or practice is willful if the person intends to commit an unfair or deceptive act.  Willful would mean that Stephen Troy and Troy Industries acted recklessly in disregard of the rights of A.R.M.S., not caring whether it was violating the law or being unfair.  An unfair or deceptive act is knowing if the person, whatever his or her intent, knows that by doing so he or she is committing an unfair or deceptive act.  *See Anthony's Pier Four, Inc. v. HBC Assocs.*, 411 Mass. 451, 475, 583 N.E.2d 806, 821-22 (1991).

## V.   PROPOSED CONCLUSIONS OF LAW

### A.   Defendants Violated Massachusetts Unfair Trade Practices Law.

1.     Plaintiff's theories of liability under Chapter 93A are derivative of its state law claims, including the breach of fiduciary duty and misappropriation of trade sections claims.  A trial judge has discretion to consider a jury's findings in making an independent determination of a Chapter 93A claim, *see Professional Services Group, Inc. v. Town of Rockland*, 515 F.

Supp.2d 179, 196 (D. Mass. 2007), and here the jury verdict supports Plaintiff's claims under Chapter 93A.

2.       A.R.M.S. is entitled to judgment in its favor on the Chapter 93A claims, in addition to the claims upon which the jury verdict is based.

3.       Defendants' acts violate Chapter 93 A because their actions (1) are within at least the penumbra of some common-law, statutory, or other established concept of unfairness; (2) are immoral, unethical, oppressive, or unscrupulous; and (3) caused substantial injury A.R.M.S., a competitor.  *Massachusetts Eye and Ear Infirmary*, 412 F.3d at 243 (quoting *PMP Assocs.*, 366 Mass. 593, 596, 321 N.E.2d 915).

4.       Defendants' misappropriation of A.R.M.S.'s trade secrets, including wrongful use of those trade secrets to further a competitive interest, constitutes unfair competition under Chapter 93A.  *E.g., Jillian's Billiard Club of Am., Inc.*, 619 N.E.2d 635 (defendant violated chapter 93A by using trade secret consisting of plaintiff's financial information to establish competing billiard parlor); *Peggy Lawton Kitchens, Inc. v. Hogan*, 466 N.E.2d 138, 18 Mass. App. Ct. 937 (1984).

5.       Stephen Troy's breach of fiduciary duty also is unfair competition for the purposes of Chapter 93A.  *E.g., Industrial General Corp. v. Sequoia Pacific Systems Corp.*, 44 F.3d 40 (1st Cir. 1995).

**B.       Defendants' Conduct Was Willfully and/or Knowingly Unfair.**

6.       At the very least, in misappropriating and wrongfully using A.R.M.S.'s trade secrets, and in breaching a fiduciary duty to A.R.M.S., Stephen Troy and Troy Industries acted recklessly in disregard of the rights of A.R.M.S., not caring whether they violated the law or were being unfair.

21

7.      With respect to Stephen Troy, however, A.R.M.S. would not have disclosed its trade secrets and other confidential and proprietary business information to Mr. Troy unless he had signed the Nondisclosure Agreement.  Whatever his intent, Mr. Troy knew he was acting unfairly and deceptively when he wrongfully took and used A.R.M.S.'s trade secrets within days of his termination.  *See Anthony's Pier Four, Inc.*, 583 N.E.2d at 821-22.  This carried over into the litigation in this case, where Defendants hid sales to Smith & Wesson, interfered with subpoenas and even tried to explain away the $200 net profit number used to justify the verdict in prior litigation.

8.      Stephen Troy knew he occupied a position of trust at A.R.M.S. and was being trained as a successor to Richard Swan.  He was allowed access to the most sensitive A.R.M.S.'s prototype and developmental information, and then, when he was fired, he intentionally wrongfully took and used that trade secret information to compete with A.R.M.S. and for the purposes of willfulness, claimed it as his own by applying for a patent on the clamping mechanism invention he wrongfully took from A.R.M.S.  (Exh. 201.)

**C.      Defendants' Conduct Caused Injury.**

9.      Defendants' actions harmed A.R.M.S.  Among other things, A.R.M.S. lost its first to market opportunity and was deprived of sales.  (Day 2, 72.)

10.      A.R.M.S. proved that as a direct result of Defendants' unfair acts, it suffered damages that are capable of proof to a reasonable degree of certainty, including lost profits and disgorgement damages.

11.      In light of the evidence, A.R.M.S. is entitled to recovery under Chapter 93A, § 11 for its damages caused by Defendants' unfair or deceptive act or practice, including all losses that were the foreseeable consequence of Defendants' unfair or deceptive act or practice.

*DiMarzo v. American Mut. Ins. Co.*, 449 N.E.2d 1189, 1200 (Mass. 1983).

12.     An award based on the evidence introduced as to Defendants' profits, i.e. $2,242,000, is an appropriate award for the Chapter 93A violation in this case.  *Mill Pond Assoc. v. E&B Giftware*, 751 F. Supp. 299, 300 (D. Mass. 1990).

13.     Moreover, Defendants' actions were a willful or knowing violation of Chapter 93A, so A.R.M.S. is entitled to an award of "up to three, but not less than two, times" of its actual damages.  M. G. L. ch. 93A, § 11; *Anderson v. Comcast Corp.*, 500 F.3d 66, 74 (1st Cir. 2007).

14.     A.R.M.S. also is entitled to its attorneys' fees, expenses and reasonable costs, including expert fees.  M. G. L. ch. 93A, § 11.  *Maillet v. ATF-Davidson Co.*, 407 Mass. 185, 194, 552 N.E.2d 95 (1990) ("As far as costs are concerned, reasonable expert witness fees should normally be recovered in a c. 93A case in order to vindicate the policies of the act"); *Jet Line Services, Inc. v. American Employers Ins. Co.*, 537 N.E.2d 107, 115 (Mass. 1989) (Where a violation of 93A causes injury to a plaintiff, that plaintiff is entitled to attorneys' fees).

## VI.     CONCLUSION

For the forgoing reasons, Plaintiff Atlantic Research Marketing Systems, Inc. respectfully submits that the Court should find in its favor on the Chapter 93A claims against Defendants.

Respectfully submitted,


SCOTT & BUSH LTD.


 /s/ Christine K. Bush
Craig M. Scott (BBO No. 556210)
cscott@scottbushlaw.com
Christine K. Bush (BBO No. 635381)
cbush@scottbushlaw.com
Scott & Bush Ltd.
30 Kennedy Plaza, Fourth Floor
Providence, RI 02903
(401) 865-6035 - Phone
(401) 865-6039 - Fax

*Attorneys for Plaintiff Atlantic Research
Marketing Systems*

24

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on the 24th day of July, 2009 a true copy of the foregoing ***Plaintiff's Proposed Findings of Fact and Conclusions of Law*** was filed through the ECF system and will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF), including those listed below, and copies will be mailed to those indicated as non-registered participants.

Thomas P. McNulty, Esq.
Ann Lamport Hammitte, Esq.
Lando & Anastasi, LLP
Riverfront Office Park
One Main Street
Cambridge, MA 02142

Damian R. LaPlaca, Esq.
Donovan Hatem LLP
Two Seaport Lane
Boston, MA 02210

                                                                  /s/ Christine K. Bush
                                                              Christine K. Bush, Esq.

M:\clients\Atlantic Research Marketing Systems\Troy\Pleadings\Trial Filings\Proposed Findings of Fact and Conclusions of Law