IN THE UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| ATLANTIC RESEARCH MARKETING SYSTEMS, INC., <br><br> Plaintiff, <br><br> v. <br><br> STEPHEN P. TROY, JR. AND TROY INDUSTRIES, INC., <br><br> Defendants. | Civil Action No. 07-cv-11576 (PBS) |

**PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW
OF STEPHEN P. TROY, JR. and TROY INDUSTRIES, INC.**

## I.     FINDINGS OF FACTS

**A.  Stephen Troy's Extensive Military and Law Enforcement Experience**

1.     Stephen Troy ("Mr. Troy") has been a Massachusetts State Trooper for ten years.  He has an associates degree in industrial security from Northwestern Connecticut Community College and bachelor's degree in law enforcement from Western New England College.  He is currently enrolled as a master's degree student at the same university.  (Trial Transcript Day 5, page 19.).

2.     Mr. Troy has a long history in the military, first joining the Civil Air Patrol, an Air Force Cadet program.  From there he joined the Connecticut National Guard in 1987.  Mr. Troy has served with the Air Force Reserves for 22 years, from 1994 to the present.  Day 5, 19-20, 22.  He is a 1988 Honor Graduate of the United States Police Force Academy.  In 2006 he graduated from the Air Force Non-Commissioned Officer Academy.  Day 5, 22-23.

  3.  Mr. Troy has an extensive amount of small arms weapons training with the Civil Air Patrol, the Air Force Combat Command Combat Rifle Course, the Air Training Command Foreign Weapons Familiarization Course.  All of these courses involve training on the M4 SOPMOD[1] Carbine.  Day 5, 23.

  4.  Mr. Troy first began using the M16 and M4 weapons in 1987 in the Connecticut National Guard.  Day 5, 21.

  5.  The Department of Defense has qualified Mr. Troy as an expert on the M4 SOPMOD Carbine and the M16 Rifle.  Mr. Troy has numerous small arms weapons qualifications from the U.S. Department of Defense on the M4 SOPMOD Carbine, the M16 Rifle, machine guns, grenade launchers, pistols, and revolvers.  Day 5, 24- 25.  Mr. Troy has security clearances from the Department of Defense and Department of Energy.  Day 5, 33.

  6.  Mr. Troy has received several military honors, including (1) the Armed Forces Expeditionary Medal for Operation Southern Watch, (2) the National Defense Medal, (3) (4) the War on Terror Medal, (5) the Humanitarian Medal and the Longevity Service Medal, (6) the Meritorious Service Medal, (7) the Professional Military Education Ribbon, and (8) the Civil Air Patrol Billy Mitchell Award.  Day 5, 25, 34.

  7.  Mr. Troy has held military teaching positions on the use of the M4 and the M16 while stationed in the Persian Gulf.  Mr. Troy taught troops the features of these weapons and how they are used.  Day 5, 26.  He was selected out of the entire Air Force Reserves to be the lead instructor for the Air Force Defender Challenge team for advance instruction on the M4 and M9 pistol.  Day 5, 26.

---

[1] SOPMOD stands for Special Operations Peculiar Modification.  Day 5, 24.

8.      Mr. Troy has also had a career in law enforcement which includes advanced training on small arms weapons.  Day 5, 29.  He graduated from the Massachusetts State Police Academy in 1999 with a rank of 8th in his class and was awarded the Top Gun Award.  Day 5, 31.  He also was awarded the Top Gun Award from the Agawam and Amherst police departments.  Day 5, 31.  He attended the Colt Firearms M16 and M4 armorers' course to teach for law enforcement and military personnel to assemble, disassemble and repair these weapons.  Day 5, 30.  Colt is the manufacturer of the M4 and M16.  Colt is the sole manufacturer of the M4 carbine for the U.S. military.  Day 5, 21.  He also attended the armorer's schools of Smith & Wesson and Glock, two of the world's largest manufacturers of handguns.  Id.

9.      Mr. Troy has held numerous design consultancy engagements under Non-Disclosure Agreements with the world's largest small arms weapons manufacturers.  For Colt Firearms, Mr. Troy was a design consultant for the M4 grenade launcher sight mount and assault sling.  Also for Colt Firearms, from 1995 through 2005 Mr. Troy did testing and evaluation.  Day 5, 34.

10.     In 2001 and 2002 Mr. Troy was a design consultant to RD Systems, a manufacturer in Illinois, for the M14 SOPMOD rifle.  The M14 is a larger caliber rifle that was issued in the 1950's.  The consultancy was to create a smaller unit that could be issued to Special Operations.  Day 5, 35.

11.     Since 2006 Mr. Troy became a design consultant to Sturm Ruger Company, located in New Hampshire, one of the largest rifle producers in the world.  Mr. Troy consults on a rifle (SR-556) that is an advanced version of the M4.  This

consultancy addressed an iron sight system on the rifle to make it appear more modular. Day 5, 37.

12. Mr. Troy has also consulted to Israeli military manufacturers, TDI Arms Israel and Helopoint. For TDI, Mr. Troy assisted them in designing a drop-in rail handguard system for the M4 and M16. A drop-in system does not free float. Day 5, 37.

13. For Patriot Ordnance, an Arizona rifle manufacturer, Mr. Troy was a design consultant on a pistol driven advanced version of the M4 carbine. Day 5, 37-38.

14. Mr. Troy consulted to the Armor Development Corp. in California on an M4 carbine mounted, bullet proof battle shield. For Smith & Wesson, Mr. Troy was a design consultant on its pistol program and on the M4 carbine. He was an assembly fixture designer for the factory, and he designed fixtures that would allow the operator to mount the parts onto the gun easily and have tools in reach. He instructed the first tier assembly workers on how to put the M16 together. Day 5, 38.

15. For Heckler & Koch, he was a design consultant for its pistol driven M4 carbine. Day 5, 39. For FN Herstal, Mr. Troy was a manufacturing consultant on plating and colorized plating of weapons. Day 5, 39.

16. In 2001, Mr. Troy and Matt Penardi, a military colleague, created Basher Technical Consultants to train police, fire and first responders on the use of the M4 carbine. Day 5, 32, 40-41. Basher signed a Non-disclosure Agreement with ARMS, and there is no evidence that Basher violated that Agreement.

**B.  Troy Industries, Inc.**

17. With his wife, Mr. Troy co-founded Troy Industries, Inc. ("Troy Ind.") in January 15, 2003 with the support and encouragement of Richard Swan, the co-founder

of A.R.M.S. Day 5, 72. The purpose of Troy Ind. is "[t]o design, create, develop, manufacture, customize, repair, buy, sell and trade firearms and related equipment and accessories." Exhibit 69.

18. The primary purpose in creating Troy Ind. was to further Troy's distribution of the SOPMOD M14. Day 5, 73. Troy thought that the high end consumer in the small arms area and federal agencies would have an interest in this rifle.

### C. Troy's Employment with ARMS

19. On June 28, 2002 Stephen Troy signed a Non-Disclosure Agreement with ARMS in becoming a part time employee of ARMS. Exhibit 54. Stephen Troy was employed part time until February 28, 2003.

20. The Non-Disclosure Agreement required ARMS to stamp anything it considered to be proprietry with a stamp identifying it as proprietary: "Any written proprietary information must be identified as proprietary by an appropriate stamp or legend at the time of disclosure to the receiving party."  In addition, "Any proprietary information which is disclosed orally shall be concurrently identified as proprietary and such claim shall be confirmed in written form to the receiving party within thirty (30) calendar days. Exhibit 54.

21. Nothing that ARMS showed to Troy was stamped proprietary in accordance with the Non-Disclosure Agreement. ARMS did not ever confirm in writing that anything disclosed to Troy orally was proprietary to ARMS.

22. ARMS fired Troy on February 28, 2003, on the pretext that an M14 Mount had been machined improperly, and that Troy had secretly set up a booth at the next year's SHOT show in 2004. However, machining the M14 Mount was the responsibility

of Bay State Machine, and Swan knew that Mr. Troy had set up a booth a the 2004 SHOT Show during the 2003 SHOT Show, and Mr. Swan was with Troy when Troy registered for the SHOT Show. [cite?]

### D.   The So-Called 1999 Proof of Concept

23.   The so-called 1999 Proof of Concept alleged by ARMS to be one of its trade secrets was actually a competitor's handguard cut off at each end.  Day 2, 78.  ARMS did not manufacture the handguard and it did not stamp the handguard with any stamp in accordance with the Non-Disclosure Agreement.

### E.   The Problems with the M16 Were Public Knowledge

24.   According to Lucius "Gus" Taylor, a program manager of the Naval Surface Warfare Center in Crane, Indiana, problems with overheating of the M16 have been public knowledge in the military since the Vietnam War.  Day 3, 35-36.  Mr. Taylor testified that overhearing was the subject of "a big debate among industry and government."  Day 3, 37.  This Country's fighting forces had long been aware of the overheating in battle.  Day 3, 36.

25.   The Navy gave yearly presentations to industry that addressed the overheating problem, and The National Defense Industrial Association (NDIA) posted the presentations on the internet.  Day 3, 38.  According to Mr. Taylor, the Navy "held a lot of these conferences to express our problems."  Day 3, 39.  The problems were not limited to overheating, but also included loose barrels.  Day 3, 39.

26.   Despite ARMS' contention, Dick Swan did not identify the overheating issue to the military.  Day 3, 37-38.

27. Several NDIA members sought to address the overheating problem, including Reed Knight of Knight's Armament, Ernst Mauch of Keckler & Koch, Bill Grube of Night Vision Equipment Company, Ron Barrett of Barrett Rifles, Richard Swan of ARMS, Marty Daniels of Daniels' Defense, and Karl Lewis of Machine Tool.  Day 3, 39.

28. Mr. Taylor held "closed session" conversations with industry, which including Richard Swan, both at the NDIA conferences and at the SHOT show (Day 3, 23-24).  However, ARMS put on no evidence that Mr. Swan or Mr. Taylor told Mr. Troy anything that was discussed in any of these "closed sessions."

**F.     The MDNS Solicitation**

29. The Navy's Miniature Day/Night Sight (MDNS) was a public government solicitation begun in 2002.  Day 3, 43.  Its overall purpose was to renovate existing systems, to miniaturize them, and to combine separate capabilities and single capabilities.  According to Mr. Taylor, "that was the Congressional intent."  Day 3, 43.

30. The MDNS solicitation reads that its purpose is to "allow the special operations forces to acquire, identify, and accurately fire on any new targets in combat."  Exhibit 64 at Bates number 468.

31. The weaponry that the Navy sought to upgrade included the M16.  Day 3, 44.  Any contractor who thought it had a viable option could propose an upgrade, and the Navy's selection was by competition.  Day 3, 43.

32. The specifications for the MDNS themselves are "Approved for public release".  See Exhibit 64 at Bates number ARMS 355.  Despite the fact that ARMS' counsel stamped them as "Highly Confidential Attorneys Eyes Only", the

specifications are published by the U.S. Government on the internet.  See, e.g., Exh. 64 at Bates number ARMS 468-474.

### G. ARMS Used a Pretext for Not Bringing the Now-Sleeved Handguard to the Market

33. As a pretext for its explanation for why ARMS designed the 50M-CV family of handguards after Troy designed the M.R.F, ARMS contended that the military required contractors proposing handguard upgrades to keep the delta ring on the M16.  In its proposed Statement of Fact number 31, ARMS fabricates the evidence in claiming that "A.R.M.S.'s initial response [to the MDNS solicitation] did not include the Proof of Concept handguard because the solicitation did not allow attaching the handguard solely to the barrel nut, which was the mechanism used by the 1999 Proof of Concept."

34. However, Mr. Taylor confirmed that the public MDNS specifications did not prohibit the removal of the delta ring.  Day 5, 46, 48.  Mr. Taylor testified: "Yeah.  There's nothing in here that prohibits – prohibits a vendor from submitting an offering that removes the delta ring, that I could see."  Day 3, 48.  See also the specifications at Exhibit 64.  Mr. Taylor participated in the drafting of the specifications.  Day 3, 32-33

35. Mr. Taylor testified that in "1999-2000" discussions with Mr. Swan, Mr. Taylor told Mr. Swan that "No, we can't take it off at this point.  You know, we are going to keep trying to get permission to take the delta ring off."  That discussion was two or three years before the March 10, 2003 MDNS specifications.  (The specifications are at exh. 64, Bates number 303).  By Mr. Taylor's testimony, those specifications did not prohibit removing the delta ring.  Day 3, 48.  Mr. Swan even participated in the drafting of the 2002 specifications.  Day 3, 33.

8

36. In fact, in its May 7, 2003, handguard proposal to the Navy, ARMS offered the Navy an option to remove the delta ring or keep the delta ring. The ARMS proposal specifically states that "The design now accommodates and provides for an option for selection of upper handguard units for use on either M4A1 weapons that have the Delta ring in place or removed; explained later in this text. (See comparison of "C" and "M" versions)." The ARMS proposal is exh. 64 at Bates number 608.

37. The C version was for customers that cannot remove the delta ring. Exhibit 64, bates number ARMS 712. The M version required the operator to remove the delta ring. Id.

38. Knight's Armament submitted a competing proposal that removed the delta ring, and it was awarded a $16 million contract. Day 3, 50, 53.

39. The Navy was not an ARMS "customer." ARMS introduced no evidence that ARMS sold anything to the Navy before the public MDNS solicitation. ARMS introduced no evidence that the Navy acquires weapons other than by a competitive, public solicitation.

40. ARMS first proposal to the Navy was for the sleeved S.I.R system (Selective Integrated Rail), Model numbers 45, 46, 50 and 58. Exhibit 61 at bates number ARMS 104. The three models that are at issue in this case did not exist at the time that ARMS submitted its proposal, the 50M-CV, the 58M-CV, and the 58M-CV MOD.

**H.  Contrary to ARMS' Contention, Free Floating Handguards Existed Within the Marketplace**

41. At the time it prepared its proposal, ARMS knew that there were other free floating handguards in the marketplace. In its proposal, ARMS recognized that "other

free floating rail systems" existed. Exh. 61, bates number ARMS 109. In its proposal, ARMS contended that its free floating handguard was superior to those currently in the marketplace. Id. Its proposal stated that "Unlike some other free floating rails systems which are difficult to remove and require disassembly of the barrel, the SIR system can be easily installed and removed from the M4A1 carbine without removing the barrel." Exh. 61, bates number ARMS 0109.

42. On July 29, 2003, the Navy rejected the ARMS proposal because it did not meet the MDNS specifications because the "offering raised the sights too high and offered too many interfaces and mounting scenarios." Exhibit 63, bates number ARMS 5377; Exhibit 64, bates number ARMS 0449.

43. Instead of offering the Navy a handguard that would satisfy the MDNS specifications, on August 18, 2003, ARMS threatened the Navy with protest costs. Exhibit 63.

44. On August 23, 2004, ARMS submitted a second proposal to the Navy for the same sleeved system. The proposal sought to convince the Navy that its sleeved system met the Navy's needs: "The height of the S.I.R. System to the receive provides optimum mounting height required for today's use . . ." Exhibit 67, bates number ARMS 5433. ARMS did not produce the rejection, but the Navy also rejected the ARMS second proposal.

45. On Friday, June 12, 2009, less than 2 days before trial, ARMS produced its re-application to the Navy for the 50M-CV family of handguards. The proposal is dated February 15, 2005. This proposal contained a technical proposal that ARMS had not before produced. For the first time, ARMS had developed a handguard which by its

description "attaches independently of the top of the receiver and only attaches to the existing barrel nut." Exhibit 67, bates number ARMS 5410.

46.     Also on June 12, 2009, ARMS for the first time produced the drawings for the 50M-CV family of handguards. Exhibit 67, bates number ARMS 5412-5419.

47.     On Sunday, June 14, 2009, ARMS produced the contract the Navy awarded to ARMS worth $16.6 million. The contract is dated March 30, 2005, and is for the purchase of the 50M-CV family of handguards. Exhibit 68. Even after the Navy awarded a $16 million contract to ARMS, after the completion of the ARMS protest over the initial rejection of ARMS proposal, the Navy only purchased between 20 and 30 "test quantities" of the ARMS handguard. Day 3, 54.

### I.     Troy Independently Designed the MRF

48.     In 2003 and 2004, Troy Ind. independently developed the M.R.F. without any trade secrets of ARMS. Troy first conceived of an "eight-sided handguard that would clamp to the barrel nut alone leaving the delta ring in place, not touching the top of the receiver. And it would go around the front sight and it would have a special proprietary plating process called nickel-boron." Day 5, 86. At the time, Troy did not see in the marketplace an eight-sided handguard. Day 5, 86.

49.     At the time that Troy conceived of his eight-sided handguard, he had seen in the marketplace the ARMS sleeved S.I.R. system, the Knight's Armament free floating handguards (models URX and MRE), a Yankee Hill free-float system, a free floating system from Daniel's Defense, and a LaRue Tactical free floating system. Day 5, 87-88. There were between 10-15 competitors in the marketplace which manufactured handguards that did not clamp to the barrel nut. Day 5, 121.

11

50. With this concept Troy sought to "free-float the barrel like all other competitors that were out there with free-floating barrels." Day 5, 90.

51. Troy was approached by Scott Samson after Samson saw a Troy Ind. brochure. Day 5, 103. Samson suggested capability to prepare prototypes for Troy Ind., and Troy had Samson sign a Confidentiality Agreement on April 9, 2003. Day 5, 104, Exhibit 150.

52. Afterwards, Troy brought to Samson's machine shop a Knight's Armament handguard, and an ARMS sleeved S.I.R. system as background to prepare prototypes. Day 5, 107.

53. Samson introduced to Troy to Dave Beaudet, who worked with Samson to prepare drawings for Troy. Beaudet prepared a full set of 3D models on Pro/E drawings for Troy of an eight-sided handguard between April and May of 2003. Day 5, 92, 107.

53. Troy became familiar with the MDNS solicitation through his work with RD Systems. Day 5, 56. RD Systems was involved with the MDNS program when RD retained Troy to consult on the SOPMOD M14 project. Day 5, 56.

54. Troy's initial concept was embodied in the beginnings of a draft proposal to MDNS dated May 7, 2003, which recited that "The Troy R.I.S. II is an eight sided extruded high strength Aluminum handguard system that has detachable rail sections that can be selectively attached to any of the eight sides for optimal placement of SOPMOD accessories." Exhibit 62. Troy's concept addressed the heating problem with the M16 and M4 that had long been public knowledge in the industry and in the military:

> The design of the current issue RIS allows heat to travel from the front
> sight/gas block through the insulted (sic) aluminum hand guard to the
> barrel nut causing heat build up. With the combination of this heat and the
> weight applied to the barrel by mounted accessories, the M203 [grenade

launcher] and the forward grip, the barrel starts to droop down as the aluminum upper receiver turns oval shaped.  This can result in catastrophic failure of the M-4 as the bolt lugs can shear as the barrel extension raises as the barrel dips.  Exhibit 62.

55.     Page 3 of the draft describes the boron plating: "The Troy R.I.S. is plated with Nickel Boron (5th Generation) which is superior to all other known industry plating. Nickel boron allows operation in any temperature extreme without any maintenance to the surface."  Exhibit 62.

56.     Troy did not submit this to the Navy because he could not meet the Navy's deadline and he did not have the money to produce the 6 prototypes required by the Navy.  Day 5, 101.

57.     Troy continued with his concept of a free-float handguard after May of 2003.  Between May and July 2003, while Troy was in Turkey on a family vacation (Troy's wife is Turkish), Troy scrapped the eight-sided handguard and refined his "idea of actually going off the barrel nut in its entirety" and simplifying the design.  Day 5, 108.

58.     In the first week of July 2003, Troy sent to Samson an email describing his idea:

> I think we can start with an easier design which would completely replace the delta ring assembly (the part you pull back to get the handguards off. We could use 4 screws with Belleville washers instead of two and we would not need the steel wings as the handguard (top portion/main body) would drop on and we would only need to collar the underside. . . .  Less parts, less castings, more economical.  Day 5, 113, Exhibit 167.

59.     Troy had not seen in the marketplace a clamp with four screws and Belleville washers.  Day 5, 113.  Column ten of the '245 patent does not disclose a

13

handguard having a clamping force, and the special yoke described and illustrated does not have 4 screws or Belleville washers as does the Troy handguard.[2]

60.  Troy followed this email with a second one two days later reiterating his idea (because he thought Samson did not receive the first email) stating "I have come up with a genius idea for attaching the rails that will not require inserts. and (sic) we will make the lower handguards out of aluminum as well. . . . The only thing I am stuck on is how to secure the front slide in piece, but I am working on it." Day 5, 113-114. Exhibit 168.

61.  When Troy returned from Turkey in July 2003, Troy Ind. and Samson Manufacturing moved forward on Troy's design and decided to use extrusion instead of bar stock. Day 5, 115. Troy and Samson had initially discussed using bar stock to machine the handguard. Exhibit 168. Troy learned the extrusion process not from ARMS, but from his work at RD Systems, when he was doing design consulting work with RD on the SOPMOD M14 project for a Navy contract. Day 5, 99.

62.  Thereafter, Troy Ind. purchased extrusion die to create prototypes for the annual SHOT show to be held in February of 2004, and for Samson Manufacturing to machine the prototypes. Day 5,115-117. Exhibit 236. In April of 2004, Troy Ind.

---

[2] On Day 6, at sidebar, the court incorrectly stated that Mr. Troy was "dead wrong" on whether "this clamping four screws was disclosed to the public before 2003." Day 6, 81. The court seems to equate 4 screws with 2 screws. The Court stated that Mr. Troy was "wrong because it says it in the patent ['245] in Column 10. The problem is, you know, it doesn't support your [ARMS] position either because it shows a two-point – as Mr. Swan says, it's a two-point attachment because that's what the military was interested in." In making the statement that the military was interested in a two point attachment, the court relied impermissibly on hearsay. The court allowed, over the objection of Troy, testimony of Mr. Swan of what the military wanted "on his [Swan's] state of mind as to why he didn't go to market." Day 2, 27. See also Day 2, 12, 13. After the court overruled Troy's hearsay objections, the court allowed in on numerous occasions testimony of what "the government wanted". See e.g., Day 2, 49. If the court relied on this testimony for the truth of the matter asserted, then the jury most assuredly did as well, to the irreversible prejudice to Troy.

entered into a machining agreement with Samson Manufacturing for the mass production of the handguards. Day 5, 122.

63.     In order to mass produce the handguards, production drawings were needed. Samson referred to Troy Robert Conley to prepare the production drawings of the upper portion of the handguard, the lower portion, and the clamp. Day 5, 126-127. Exhibit 158.

64.     The Troy handguard, which Troy named the M.R.F (Modular Rail Forend) differs in form and function from the ARMS 50M-CV family of handguards. For instance, both Mr. Troy and Mr. Swan agree that the upper portion of the lower Troy handguard will not fit the upper portion of the ARMS handguard. Day 5, 137. The Troy handguard relies entirely on the barrel nut to mount to the receiver of the weapon, but the ARMS 50M-CV family of handguards do not. Day 5, 147.

65.     The Troy M.R.F. was in the marketplace (in 2004) two years before ARMS developed the 50M-CV family of handguards (2006). See testimony of Frank Basile, ARMS machinist, Day 3, 114-115. Basile's first invoice for the machining of the 50M-CV family of handguards was 2006. Day 3, 113-114.

66.     Mr. Basile admitted that the 1999 extrusion drawing, which ARMS offered to show the development of the 50M-CV family of handguards, did not apply to the 50M-CV family of handguards. Day 3, 116.

67.     ARMS offered testimony of Mr. Barreras to suggest that he watched Mr. Swan cut each end of a competitor's handguard to create the so called 1999 proof of concept, a non-sleeved handguard. However, Mr. Barreras testified that the S.I.R. system that he was evaluating in 2000 was not necessarily the same S.I.R. system he witnessed in

1999: "It was just a really long time ago. There were different configurations of it at the time. There were systems that were, you know, clamped like this, there were systems that were hung over and a combination of that. So which configuration I was testing at the time, I cannot honestly recall." Day 6, 74.

## II. CONCLUSIONS OF LAW

1. Unfair and deceptive trade practice claims are determined on a case-by-case basis and "[a] common law wrong does not automatically amount to a violation of Chapter 93A." Massachusetts Eye and Ear Infirmary v. QLT Phototherapeutics v. Massachusetts Eye and Ear Infirmary; Evangelos S. Gragoudas, M.D.; Joan W. Miller, M.D., 552 F.3d 47 (1st Cir. 2009), (citing Renovators Supply, Inc. v. Sovereign Bank, 72 Mass.App.Ct. 419 (2008)).

2. The trial judge is not bound by the jury's verdict, even when a parallel 93A claim is based on substantially the same facts, therefore, the trial judge can choose to "[decide] himself all aspects of the c. 93A claims." W. Oliver Tripp Company v. American Hoechst Corporation, 34 Mass.App.Ct. 744 (1993); Wallace Motor Sales, Inc. v. American Motors Sales Corporation, 780 F.2d. 1049, 1063 -1067 (1st Cir. 1985) (the First Circuit upheld the trial court's completely opposite conclusion from the jury, based on the same facts, in a 93A & B claim); see also Perdoni Brothers, Inc. v. Concrete Systems, Inc., 35 F.3d 1 (1st Cir. 1994).

3. Troy was not a fiduciary. In Industrial General Corporation v. Sequioa Pacific Systems Corporation, 44 F.3d 40 (1st Cir. 1995) the Court ruled that a fiduciary relationship exists when "First, a **party owed a fiduciary duty** is often in a **position of great disparity or inequality relative to the other party**. Second, a fiduciary duty (and

16

breach thereof) will be found to exist where the **disparity in relationship has been abused** to the **benefit of the more powerful party**, particularly where unjust enrichment would result." Id. at 44.

    4.    The Court in Industrial General Corporation further provides that, in business, if one party reposes its confidence in another, a fiduciary relationship can arise; however, the courts "have repeatedly cautioned that 'the plaintiff alone, by reposing trust and confidence in the defendant, cannot thereby transform a business relationship into one which is fiduciary in nature.'" Id. at 44, (quoting Superior Glass Co. v. First Bristol County Nat'l Bank, 380 Mass. 829 (1980)). To determine whether a transformation took place, the court will look at the defendant's knowledge of the plaintiff's reliance, consider the relation of the parties, the plaintiff's business capacity contrasted with the defendant's and the "readiness of the plaintiff to follow the defendant's guidance in complicated transactions wherein the defendant has specialized knowledge." Id. at 44 (quoting Kosow, 212 N.E.2d at 560) [full cite]

    5.    Troy, at no time, was in a superior position to ARMS. He was trying to grow his fledgling businesses (Basher Tactical, later Troy Industries) and met Swan in an attempt to form a business relationship with him because Swan was well-known in the industry. While Swan may have put his trust in Troy, there is no reason to assume this trust was anymore than exists in an employee/employer relationship. Swan was an established businessman, whereas Troy was not. Swan was/is the more powerful party and no reasonable person could find that Swan's business capacity was inferior to Troy's and that he [Swan] followed Troy's guidance as a person with specialized knowledge in this industry.

6.	In any event, the breaching behavior, under a 93A analysis, would have to "attain a level of rascality that would raise an eyebrow of someone inured to the rough and tumble world of commerce. Quaker State Oil Refining Corporation v. Garrity Oil Co., Inc., 884 F.2d 1510 (1st Cir. 1989) (quoting Levings v. Forbes & Wallace, Inc., 8 Mass.App.Ct. 498 (1979)) (former distributor's withholding of sums immediately due on trade debt and promissory notes, coupled with prosecution of counterclaims, was not a form of extortion sufficient to warrant liability under Massachusetts law for unfair trade practices).

7.	Anthony's Pier Four, Inc. v. HBC Associates , 411 Mass. 451 (1991) does not support a conclusion that Troy violated c. 93A.  In Anthony's Pier Four in a real estate development project, the owner, Anthony's, had given approval of HBC's development plans at Fan Pier for over four years.  When HBC applied for permits and was getting ready to start construction, Anthony decided he wanted more money than originally negotiated.  The Court found a violation of contract because "conduct 'in disregard of known contractual arrangements' and intended to secure benefits for the breaching party constitutes an unfair act or practice for c. 93A purposes." " Anthony's Pier Four, 411 Mass. at 474.  In contrast, there was no evidence that Troy disregarded known contractual obligations.  See also Pepsi-Cola Metropolitan Bottling Company, Inc. v. Checkers, Inc., 754 F.2d 10 at 17-18 (1st Cir. 1985) (Court found that defendants' behavior was willful and knowing when it withheld $61,000 owed to plaintiff as a "wedge" against plaintiff to "enhance defendants' bargaining power for more product"); Datacomm Interface, Inc. v. Computerworld, Inc.., 396 Mass. 760 (1986) (court found for

defendant on claim and counterclaim when it determined that plaintiff made false representation to defendant about a circulation list, "wrongfully withheld" the list at a deposition and filed lawsuit against defendant for publicity purposes with a known misstatement in the complaint).

            Respectfully submitted,

            DONOVAN HATEM, LLP

            /s/ Damian R. LaPlaca
            Damian R. LaPlaca (BBO No. 55139)
            dlaplaca@donovanhatem.com
            Two Seaport Lane
            Boston, MA  02210
            Telephone: (617) 406-4500
            Facsimile: (617) 406-4501

            and

            LANDO & ANASTASI, LLP

            Thomas P. McNulty (BBO No. 654564)
            tmcnulty@ll-a.com
            Ann Lamport Hammitte (BBO No. 553263)
            ahammitte@ll-a.com
            Riverfront Office Park
            One Main Street, 11th Floor
            Cambridge, MA  02142
            Telephone: (617) 395-7000
            Facsimile: (617) 395-7070

            *Attorneys for Defendants, Troy Industries, Inc. and Stephen P. Troy*

## CERTIFICATE OF SERVICE

I hereby certify that a true copy of the foregoing *Proposed Findings of Fact and Conclusions of Law of Stephen P. Troy, Jr. and Troy Industries, Inc.* was filed through the ECF system and will be sent electronically to the registered participants, including those persons listed below, this

Craig M. Scott, Esquire
Christine K. Bush, Esquire
Scott & Bush Ltd.
30 Kennedy Plaza
Fourth Floor
Providence, RI  02903

Thomas P. McNulty, Esquire
Ann Lamport Hammitte, Esquire
Lando & Anastasi, LLP
Riverfront Office Park
One Main Street, 11th Floor
Cambridge, MA  02142

/s/ Damian R. LaPlaca

01238747.DOC