UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

```
_____
                               )
ATLANTIC RESEARCH MARKETING     )
SYSTEMS, INC.,                  )
                               )
         Plaintiff,            )
                               )
     v.                        )   CIVIL ACTION NO. 07-11576-PBS
                               )
STEPHEN P. TROY, JR., AND       )
TROY INDUSTRIES, INC.,          )
                               )
         Defendants.           )
_____)
```

**FINDINGS OF FACT AND CONCLUSIONS OF LAW**

May 11, 2010

Saris, U.S.D.J.

## I.  INTRODUCTION

After a two week trial, a jury found Defendants Stephen P. Troy and Troy Industries (collectively "Troy") liable for misappropriation of trade secrets and breach of fiduciary duty and entered a verdict in favor of Plaintiff Atlantic Research Marketing Systems, Inc. ("A.R.M.S.") for $1,813,465.  The Court reserved judgment on Count V alleging that Troy knowingly and willfully committed unfair methods of competition and deceptive acts or practices in trade or commerce in violation of Mass. Gen. Laws ch. 93A, § 11.

## II.  FINDINGS OF FACT

### 1. A.R.M.S.

Richard Swan has worked with small arms since 1967 when he began testing and evaluating weapons, including the M16 rifle, for Colt Manufacturing.  (Trial Tr. vol. 1, 67, June 15, 2009.) He holds twenty-four patents related to small arms weapons accessories.  (Trial Tr. vol. 1, 66.)  Swan founded A.R.M.S. in 1980.  (Trial Tr. vol. 1, 64.)  It makes accessories for small arms weaponry.  (Trial Tr. vol. 1, 65.)  A.R.M.S. sells approximately sixty weapons-related products to customers including the United States military, foreign militaries, law enforcement, and the commercial market.  (Trial Tr. vol. 1, 65-66.)

A.R.M.S.' facilities had an alarm system that was linked directly to the local police; its doors were kept locked; cameras were used to monitor the front door; visitors were required to sign a log book before entering the facilities and to sign nondisclosure agreements before being provided access to proprietary information.  (Trial Tr. vol. 1, 69, 89; Exs. 5, 10, 38, 58.)

### 2. The Handguard

The issues in this case center around the M14 family of weapons (i.e. the M4, M16, and AR14).  In the 1990s, the military was having problems with the M4.  The weapon's upper receiver is

aluminum, and its barrel, which is secured to the upper receiver by a bolt, is steel.  (Trial Tr. vol. 3, 129, June 17, 2009.)  At the time, the standard issue handguards were drop-in products that attached to the barrel of the weapon; they went inside the barrel cap on the front of the weapon and were secured into place by a spring-loaded delta ring.  (Trial Tr. vol. 3, 24-25, 133-34.)  Military personnel hung accessories and grips from the handguards.  (Trial Tr. vol. 3, 24-25, 131.)  When the weapon is used, the lugs on the bolt lock, and the round is fired; gas then causes the lugs to unlock, and the spent round is extracted. (Trial Tr. vol. 3, 126.)  For some reason, the locking lugs were breaking off, preventing the weapon from firing.  (Trial Tr. vol. 3, 126.)  The barrel was also coming loose at the point where it connected to the upper receiver.  (Trial Tr. vol. 3, 128.)

    The military suspected that heat was the source of the malfunction.  (Trial Tr. vol. 3, 128-30.)  When fired rapidly, the weapon's steel barrel can heat to very high temperatures. (Trial Tr. vol. 3, 24-25, 128.)  The handguards were made of plastic or aluminum, both of which trap heat.  (Trial Tr. vol. 1, 81-82.)  As the weapon was fired, the bolt pounded into the back end of the hot barrel, reforging the aluminum receiver into an oval and causing the barrel to loosen.  (Trial Tr. vol. 3, 24-25, 128.)  The weight of the attached accessories and the force of soldiers pulling on the attached grips were also bending the barrel downward.  (Trial Tr. vol. 3, 24-25, 131.)

In 1996, Swan investigated the problem and prepared a report at the request of Major General Carl Ernst.  (Trial Tr. vol. 1, 85-86; Ex. 75.)  He also reported his concerns in 1998 to Sergeant Major Martin Barreras, a Force Modernization Officer with the U.S. Army, who was responsible for researching and evaluating equipment improvements.  (Trial Tr. vol. 1, 88; Trial Tr. vol. 2, 13, June 16, 2009; Trial Tr. vol. 3, 122.)  In December 1998, Barreras visited A.R.M.S. and discussed Swan's thoughts on the malfunction problem, including his 1996 report to Major General Ernst.  (Trial Tr. vol. 2, 12; Trial Tr. vol. 3, 136-42.)

Swan showed Barreras the A.R.M.S. Rigid Frame handguard that he had designed between 1989 and 1991.  (Trial Tr. vol. 1, 81-82; Trial Tr. vol. 3, 140-42.)  The handguard was a free float handguard; that is, it attached to the weapon without putting pressure on the barrel or conducting heat from the barrel.  (Trial Tr. vol. 1, 81-82; Trial Tr. vol. 3, 140-42; Ex. 1.)  Swan and Barreras scheduled a time to meet again.  (Trial Tr. vol. 2, 12-13.)

On January 20, 1999, Swan and Barreras met again.  (Trial Tr. vol. 3, 142-44.)  In the basement of the A.R.M.S. facility, in front of Barreras, Swan machined a Proof of Concept handguard that used a clamp to attach solely to the barrel nut of the M4 for support.  (Trial Tr. vol. 2, 14, 79; Trial Tr. vol. 3, 144-47.)  Swan took a standard-issue aluminum drop-in handguard

manufactured by Knights Armament.  (Trial Tr. vol. 2, 14-15; Ex. 4.)  He machined aluminum off the rearward end and machined notches so that after the delta ring was removed the handguard would fit down on top of the tines of the barrel nut.  (Trial Tr. vol. 2, 15-17; Ex. 3.)  Removing the delta ring allowed the handguard to align with the top of the receiver and create one continuous level plane for the attachment of various devices.  (Trial Tr. vol. 2, 17; Trial Tr. vol. 3, 146-47.)  The handguard sat directly on top of the barrel nut and sat up against the front of the receiver.  (Trial Tr. vol. 3, 147.)

Swan then took a block of aluminum with a hole in it, and used a band saw to cut it in half ("the clamp").  (Trial Tr. vol. 2, 18-19; Trial Tr. vol. 3, 101, 148-49; Ex. 15.)  Swan drilled two screw holes on either side of the clamp and matching holes in the upper handguard.  (Trial Tr. vol. 2, 21-22; Trial Tr. vol. 3, 150-51.)  The clamp fit around the bottom of the barrel nut and could be fastened to the upper handguard by screws.  (Trial Tr. vol. 2, 18-23; Trial Tr. vol. 3, 101, 148-51; Ex. 15.)  A lower handguard could then be snapped into place.  (Trial Tr. vol. 2, 23-24.)  The finished product did not touch the barrel of the weapon and clamped solely to the barrel nut for support after the delta ring was removed.  (Trial Tr. vol. 2, 23; Trial Tr. vol. 3, 145, 151-53.)

A.R.M.S. did not bring the Proof of Concept to market because Swan believed that the branches of the United States

military did not have a consensus allowing removal of the delta
ring, as the Army did not want it removed.  (Trial Tr. vol. 2,
26-27, 40-41; Trial Tr. vol. 3, 27-31.)

### 3. The Crane Submission

In 2003, A.R.M.S. prepared and submitted a response to a
request for proposal concerning handguards issued by Crane Naval
Surface Warfare Center ("Crane") in connection with the Miniature
Day Night Sight ("MDNS") Program.  (Trial Tr. vol. 2, 42; Trial
Tr. vol. 3, 42-45.)  The response did not include the Proof of
Concept because Swan (wrongly) believed that the solicitation did
not allow removing the delta ring and attaching the handguard
solely to the barrel nut.  (Trial Tr. vol. 2, 42-43; Trial Tr.
vol. 3, 27-31, 152-53.)  The solicitation did not, in fact,
prohibit removal of the delta ring.  (Trial Tr. vol. 3, 48; Trial
Tr. vol. 5, 46, 48; Ex. 64.)  Nevertheless, Swan had engaged in
discussions with relevant officials that led him to believe
removal of the delta ring was unacceptable.  (Trial Tr. vol. 2,
42-43; Trial Tr. vol. 3, 27-31, 42-43, 46, 152-53.)  As a result,
A.R.M.S. submitted a handguard system that attached to the top of
the receiver and clamped to the barrel nut, with or without the
delta ring in place.  (Trial Tr. vol. 2, 43.)

A.R.M.S.' response was rejected; A.R.M.S. appealed the
rejection to the General Accounting Office, prevailed, and
submitted a new response that included the Proof of Concept

handguard.  (Trial Tr. vol. 2, 43-48.)  Crane eventually issued a $16 million contract to A.R.M.S. for its M-CV handguard products that were based on the Proof of Concept.  (Trial Tr. vol. 3, 104-06; Trial Tr. vol. 4, 43-45, June 18, 2009; Exs. 31, 32, 33, 67, 68.)  Bay State Machine began machining the A.R.M.S. M-CV handguards in 2004, and A.R.M.S. sold its first M-CV product to Crane in 2005.  (Trial Tr. vol. 2, 50-52; Trial Tr. vol. 3, 113-15.)

### 4. Swan and Troy

Stephen Troy has been a Massachusetts State Trooper for ten years.  (Trial Tr. vol. 5, 19, June 22, 2009.)  He has an associates degree in criminal justice and in industrial security and a bachelor's degree in law enforcement.  (Trial Tr. vol. 5, 19.)  He has served in the Civil Air Patrol, the Connecticut National Guard and the Air Force Reserves.  (Trial Tr. vol. 5, 19-20, 22.)  He graduated from the United States Air Force Police Academy and the Air Force Academy Non-Commissioned Officer Academy.  (Trial Tr. vol. 5, 22-23.)  In the military he received small arms weapons training, including training with the M4. (Trial Tr. vol. 5, 23.)  He has numerous small arms weapons qualifications, including qualifications with the M4 and M16; he has held various teaching positions, including teaching soldiers on the use of the M4 and M16; and he has received numerous military honors.  (Trial Tr. vol. 5, 24-27, 34.)  He attended the

Colt Firearms M16 and M4 armorer's course which taught law
enforcement and military personnel to assemble, disassemble and
repair the weapons.  (Trial Tr. vol. 5, 30.)

Troy met Swan in 2002, when Troy was running Basher
Tactical, a law enforcement training business to teach police on
the use of the M4 carbine, and a customer of A.R.M.S.'.  (Trial
Tr. vol. 2, 52-53.)  Troy asked to be an A.R.M.S. distributor.
(Trial Tr. vol. 2, 52-53.)  A.R.M.S. allowed Troy to become a
distributor after he signed a Distributor Agreement, which
contained a confidentiality provision.  (Trial Tr. vol. 2, 52-53;
Ex. 53.)  Soon afterwards, A.R.M.S. hired Troy as a regular
employee.  (Trial Tr. vol. 2, 53-54.)  Before beginning work,
Troy signed a non-disclosure agreement.  (Trial Tr. vol. 2, 55;
Trial Tr. vol. 6, 26-27, June 23, 2009; Ex. 54.)  Swan told Troy
that all A.R.M.S. business and development information was
confidential and proprietary.  (Trial Tr. vol. 2, 57-58.)  Troy
felt obligated to maintain the confidentiality of the information
he learned from A.R.M.S.  (Trial Tr. vol. 6, 27.)  Troy
understood that his discussions with Swan were confidential.
(Trial Tr. vol. 6, 29.)  Troy understood that Swan trusted him,
and they discussed that Swan was training Troy to be his
successor at A.R.M.S.  (Trial Tr. vol. 6, 29-30.)

Swan taught Troy all of the essential information about
A.R.M.S. and sent him out to customers, vendors, industry shows,
and machine shops as his right-hand man.  (Trial Tr. vol. 2, 54-

61; Trial Tr. vol. 6, 30.)  He gave Troy the necessary
information to train distributors, and familiarized him with
A.R.M.S.' computer programs and equipment.  (Trial Tr. vol. 2,
54-61.)  Swan introduced Troy to A.R.M.S.' machinist and taught
Troy A.R.M.S.' design and manufacturing processes.  (Trial Tr.
vol. 2, 54, 60, 115; Trial Tr. vol. 3, 87-91, 107.)

One of Troy's responsibilities was new product development.
(Trial Tr. vol. 6, 27-29.)  Swan showed Troy the Proof of Concept
and all the other proofs of concept that A.R.M.S. had.  (Trial
Tr. vol. 2, 56-57, 81-82.)  Troy's desk was approximately eight
feet from where A.R.M.S. stored the prototypes and proofs of
concept.  Swan talked to Troy about the M4 failures and the
development of his handguards.  (Trial Tr. vol. 2, 56-57; Trial
Tr. vol. 3, 91-92.)

In January 2003, Troy and his wife incorporated Troy
Industries, Inc. with the knowledge of Swan.  (Trial Tr. vol. 5,
72-73; Ex. 69.)  In February 2003, Troy and Swan attended the
SHOT Show, a large industry show at which A.R.M.S. had a booth.
(Trial Tr. vol. 2, 63-64.)  Swan allowed Troy to promote a
modified M14 weapon (the "SOPMOD M14") that Troy had been working
on, but which did not compete with any A.R.M.S. product.  (Trial
Tr. vol. 2, 62-63; Trial Tr. vol. 5, 63-67; Ex. 60.)  Troy hoped
that a high-end consumer in the small arms area and federal
agencies would have an interest in the rifle.  (Trial Tr. vol. 5,
72-73.)

-9-

At the show, Swan learned that Troy had registered for Troy Industries to have its own booth at the 2004 show.  (Trial Tr. vol. 2, 63-64; Trial Tr. vol. 6, 34-35.)  Claiming he was outraged when he heard about the booth, and criticizing Troy for other alleged malfeasance, Swan terminated Troy by letter dated Friday, February 28, although Troy did not receive the letter until Monday, March 3.  (Trial Tr. vol. 2, 64; Trial Tr. vol. 6, 37; Ex. 59.)  Troy claims Swan's reasons were a pretext. Whatever the truth behind the firing, there was bad blood between the men after the discharge.  The notice of termination indicated that Troy was to return a laptop he had been using for A.R.M.S. business, but he did so only after significant delay and after he deleted its contents.  (Trial Tr. vol. 2, 65, 105-06; Ex. 59.)

## 5. Troy Industries

When Troy was fired, Troy Industries had only the SOPMOD M14 for sale.  (Trial Tr. vol. 6, 37.)  Troy contacted A.R.M.S.' machinist, Frank Basile, to ask if he would work with him, but Basile declined.  (Trial Tr. vol. 2, 66-67; Trial Tr. vol. 3, 108.)  Knowing about the Crane MDNS solicitation from his time at A.R.M.S., Troy contacted Crane and offered a handguard system. (Trial Tr. vol. 2, 66; Trial Tr. vol. 3, 34-35.)  Although Troy had never designed a handguard system prior to being fired by A.R.M.S., he prepared a response to the Crane MDNS solicitation, which was dated March 5, 2003 – two days after his termination.

(Trial Tr. vol. 6, 20-21, 38-39; Ex. 62.)   Troy's response
featured a free-floating eight-sided handguard.  (Trial Tr. vol.
5, 98-99; Trial Tr. vol. 6, 40; Ex. 62.)   Troy says he decided,
however, that the necessary research and development was too
expensive.  (Trial Tr. vol. 5, 101-02.)

        While on vacation in Turkey between May and July, 2003, Troy
claims that he had a Eureka moment, and independently came up
with an idea for a novel handguard in which the delta ring would
be removed, the upper handguard piece would attach to a clamp
with four screws, and the clamp would attach solely to the barrel
nut of the weapon, with a removable lower handguard piece.
(Trial Tr. vol. 2, 71, 77; Trial Tr. vol. 5, 108-09, 112-13, 128-
31, 147; Trial Tr. vol. 6, 43; Ex. 70, Ex. 16.)   This testimony
was not credible.  I find that Troy derived this concept from
Swan's trade secrets.

        Troy then proceeded to manufacture and sell a handguard that
clamped solely to the barrel nut as the "Modular Rail Forend"
("MRF") in a variety of lengths.  (Trial Tr. vol. 2, 70; Trial
Tr. vol. 3, 90-91; Ex. 70.)   Troy incorporated A.R.M.S.' trade
secrets and proprietary information into the handguards; namely,
the idea behind A.R.M.S.' Proof of Concept.  Troy first offered
the MRF handguards for sale at the 2004 SHOT Show.  (Trial Tr.
vol. 5, 120; Ex. 71.)   Troy later applied for a patent to cover
the MRF products.  (Trial Tr. vol. 5, 152; Ex. 201.)

        Troy's MRF products compete with A.R.M.S.' M-CV products and

-11-

are used on the same weapons.  (Trial Tr. vol. 4, 45-47; Trial
Tr. vol. 5, 149-52.)  Troy's 7-inch MRF-C product is comparable
to A.R.M.S.' 50 M-CV product; Troy's 9-inch MRF-M product is
comparable to A.R.M.S.' 50 M-CV product; Troy's 10-inch MRF-MX
product is comparable to A.R.M.S.' 50 M-CV product; and Troy's
12-inch MRF-CX product is comparable to A.R.M.S.' 58 M-CV MOD
product.  (Trial Tr. vol. 4, 46-47, 64.)

     Plaintiff's expert, Catherine Parente, used standard
methodology for computing disgorgement damages by determining the
profits earned by Troy on sales of the MRF products from 2004
through December 31, 2006.  (Trial Tr. vol. 4, 92-94, 100.)
Parente multiplied the number of Troy's MRF products sold by
$200, which represented Defendants' net profits on each sale.
(Trial Tr. vol. 4, 96-99.)  The $200 figure was based on Troy's
prior sworn testimony concerning Troy's average net profits on
retail and wholesale sales of MRF products during the same
period.  (Trial Tr. vol. 4, 96-97, 121-22; Trial Tr. vol. 6, 18-
20, 61-66; Ex. 255.)  Troy relied on and advanced the $200 net
profit per unit figure in a prior proceeding.  Parente calculated
A.R.M.S. total disgorgement damages to be $2,242,000.  (Trial Tr.
vol. 4, 95.)  Parente likewise calculated A.R.M.S.' lost profits
as $414,460.  (Trial Tr. vol. 4, 103-05.)  Troy offered no
damages expert, and its only witness testified that he could not
identify specific costs associated with the manufacture of the
MRF products for any given period, nor could he testify

competently concerning the basis for those costs.  (Trial Tr.
vol. 6, 16-17.)

On June 26, 2009, the jury returned a verdict in favor of
A.R.M.S., finding that Troy had misappropriated A.R.M.S.' trade
secrets or confidential and proprietary information and that
Stephen P. Troy had breached his fiduciary duty to A.R.M.S.  The
jury awarded A.R.M.S. $1,813,465.

### III.  CONCLUSIONS OF LAW

Under Chapter 93A, "unfair or deceptive acts or practices in
the conduct of any trade or commerce" are unlawful.  Mass. Gen.
Laws ch. 93A, § 2(a).  To determine whether a practice violates
Chapter 93A, the fact-finder must look to "(1) whether the
practice . . . is within at least the penumbra of some common-
law, statutory, or other established concept of unfairness; (2)
whether it is immoral, unethical, oppressive, or unscrupulous;
[and] (3) whether it causes substantial injury to consumers (or
competitors or other businessmen)."  Mass. Eye & Ear Infirmary v.
QLT Phototherapeutics, Inc., 412 F.3d 215, 243 (1st Cir. 2005)
(quoting PMP Assocs., Inc. v. Globe Newspaper Co., 366 Mass. 593,
596, 321 N.E.2d 915, 917 (1975)).  Courts evaluate unfair and
deceptive trade practice claims based on the circumstances of
each case.  Kattar v. Demoulas, 433 Mass. 1, 13-14, 739 N.E.2d
246, 257 (2000).  A claim of misappropriation of trade secrets
can support a claim under Chapter 93A.  Incase, Inc. v. Timex

<u>Corp.</u>, 421 F. Supp. 2d 226, 239-40 (D. Mass. 2006); <u>Jillian's</u>
<u>Billiard Club of Am., Inc. v. Beloff Billiards, Inc.</u>, 619 N.E.2d
635, 639 (Mass. App. Ct. 1993).

A.R.M.S.' theories of liability under Chapter 93A are
derivative of its state law claims, particularly its claim of
misappropriation of trade secrets.  The Court has discretion to
consider a jury's findings in making an independent determination
of a Chapter 93A claim, and the jury's verdict supports finding a
violation of Chapter 93A.  <u>Prof'l Servs. Group, Inc. v. Town of</u>
<u>Rockland</u>, 515 F. Supp. 2d 179, 194-96 (D. Mass. 2007); <u>Guity v.</u>
<u>Commerce Ins. Co.</u>, 631 N.E.2d 75, 76 (Mass. App. Ct. 1994);
<u>Refuse & Envtl. Sys., Inc. v. Indus. Servs. of Am., Inc.</u>, 932
F.2d 37, 42 n.2 (1st Cir. 1991).

Here, Troy misappropriated A.R.M.S.' trade secrets and
wrongfully used those trade secrets to further a competitive
interest.  Under the circumstances, the Defendants' actions are
"within at least the penumbra of some common-law, statutory or
other established concept of unfairness," and are "immoral,
unethical, oppressive, or unscrupulous."  <u>Mass. Eye & Ear</u>
<u>Infirmary</u>, 412 F.3d at 243 (quoting <u>PMP Assocs.</u>, 366 Mass. at
596, 321 N.E.2d at 917).  As the Defendants' actions deprived
A.R.M.S. of sales and cost it profits, they "cause[d] substantial
injury" to a competitor.  <u>Id.</u> (quoting <u>PMP Assocs.</u>, 366 Mass. at
596, 321 N.E.2d at 917).  As such, the Defendants' conduct
violated Chapter 93A.

-14-

Under Chapter 93A, the base "recovery shall be in the amount of actual damages." Mass. Gen. Laws ch. 93A, § 11. As a general matter, "actual damages" are understood as the losses that flow foreseeably from the harmful conduct. See Haddad v. Gonzalez, 410 Mass. 855, 867, 576 N.E.2d 658, 665 (1991). The Massachusetts Supreme Judicial Court and Appeals Court have not addressed whether disgorgement damages are an appropriate measure of recovery under Chapter 93A. Kelley v. CVS Pharmacy, Inc., 2007 WL 2781163, at *12 (Mass. Super. Ct. Aug. 24, 2007). One court has analyzed the issue and determined that disgorgement damages can be an appropriate measure of recovery, but in that case, there was no other measure of damages available. Id. at *11-15. Here, a second measure of damages is available: lost profits. Given the statute's focus on actual monetary loss and damage, the Court determines the proper measure of damages here to be A.R.M.S.' lost profits, $414,460. See Refuse & Envtl. Sys., 932 F.2d at 43; Arthur D. Little, Inc. v. Dooyang Corp., 147 F.3d 47, 56-57 (1st Cir. 1998).

Where a defendant's actions are a willful or knowing violation of Chapter 93A, the plaintiff is entitled to an award of "up to three, but not less than two, times" its actual damages. Mass. Gen. Laws ch. 93A, § 11. Although Troy's actions were unfair, they do "not rise to the level of callousness or meretriciousness that would justify multiple damages." Cambridge Plating Co., Inc. v. Napco, Inc., 85 F.3d 752, 771 (1st Cir.

1996).  Conduct that gives rise to a violation of Chapter 93A is

not enough, by itself, to warrant multiple damages.

> [S]hades of culpability are supposed to matter in
> applying the punitive damages provision of the statute.
> See Kansallis Fin. Ltd. v. Fern, 421 Mass. 659, 659
> N.E.2d 731, 738 (1996) ("[T]he Legislature envisaged
> multiple damage awards against those defendants with a
> higher degree of culpability than that sufficient to
> ground simple liability."); Heller v. Silverbranch
> Constr. Corp., 376 Mass. 621, 382 N.E.2d 1065, 1070
> (1978) (only "callous and intentional violations" merit
> multiple damages); VMark Software, Inc. v. EMC Corp.,
> 642 N.E.2d 587, 596 (Mass. App. Ct. 1994) (court
> refused to multiply damages in intentional
> misrepresentation case stating that section 11 multiple
> damages are an "extraordinary remedy" not applicable to
> a case of "dogged bumbling").

Id. at 770.  Liability is not enough to trigger punitive damages:

"there must be something more."  Id.

    In Incase Inc. v. Timex Corp., 421 F. Supp. at 239-42, the

district court found that a violation of Chapter 93A had

occurred, but that it was not "knowing or willful."  Although the

court found no misappropriation of trade secrets had occurred

because Incase had taken "inadequate steps to protect the secrecy

of its design," it was a violation of Chapter 93A

> for Timex to engage Incase to develop a design by
> holding out the promise of a lucrative manufacturing
> deal; for Timex to then use that information to have an
> Incase competitor manufacture a similar product, which
> Timex could presumably obtain for lower cost because it
> did not have to pay the competitor to develop the
> design; and for Timex to then breach its contract with
> Incase for the original product based on a lack of
> demand.

Id. at 240-41.  Despite the fact that Timex induced Incase to

expend significant effort to develop a design specifically for

-16-

Timex, gave the design to Incase's competitor, and then used the very result of its malfeasance to replace what it was contractually obligated to buy from Incase, the court found Timex' 93A violation not to be "knowing or willful." Id. at 242.

On appeal, the First Circuit affirmed the district court's conclusion. The First Circuit noted that:

> [t]he cases, again, are unclear about what constitutes willful or knowing behavior, but most of them tend to cluster around findings of: (a) coercion or extortion, see Anthony's Pier Four, Inc. v. HBC Assocs., 411 Mass. 451, 583 N.E.2d 806, 822 (1991) (withholding monies owed as a form of extortion is willful); Pepsi-Cola Metro. Bottling Co. v. Checkers, Inc., 754 F.2d 10, 18 (1st Cir. 1985) (withholding payment as a wedge to enhance bargaining power is willful); (b) fraud and similar forms of misrepresentation, see Datacomm Interface, Inc. v. Computerworld, Inc., 396 Mass. 760, 489 N.E.2d 185, 197 (1986); Serv. Publ'ns, Inc. v. Goverman, 396 Mass. 567, 487 N.E.2d 520, 528 n.13 (1986); see also Computer Sys. Eng'g, Inc. v. Qantel Corp., 740 F.2d 59, 67-68 (1st Cir. 1984) (a willful or knowing violation includes "a misrepresentation made with reckless disregard as to its truth or falsity"); or (c) abusive litigation, see Fed. Ins. Co. v. HPSC, Inc., 480 F.3d 26, 37 (1st Cir. 2007); Int'l Fid. Ins. Co. v. Wilson, 387 Mass. 841, 443 N.E.2d 1308, 1318 (1983). There was no evidence presented of coercion, fraud, abusive litigation, or similar behavior by Timex, and thus we find no error in the district court's decision to withhold punitive damages.

Incase Inc. v. Timex Corp., 488 F.3d 46, 58 (1st Cir. 2007).

Although Troy misappropriated A.R.M.S.' trade secrets, there was no evidence that he did so maliciously. There was no evidence to suggest that Troy entered into A.R.M.S.' employ for the specific purpose of stealing trade secrets or that the idea ever occurred to him while he was there. There was no evidence

that he ever misrepresented himself or his intention to A.R.M.S. or undertook any sort of fraud.  There was no evidence that Troy was attempting to harm A.R.M.S. with the actions he took after he was terminated.  There was no evidence that Troy believed, or had any reason to believe, that he was directly damaging A.R.M.S. by manufacturing and selling his handguards as A.R.M.S. was not using the technology or even gearing up to do so at the time that Troy was terminated.  Troy's actions lack the malfeasance of extortion, fraud, or abusive litigation.  Thus although Troy's actions were unfair, they lack that "something more" that would make punitive damages appropriate.  As Troy's actions were neither "knowing or willful," the Court does not impose multiple damages.

As A.R.M.S.' 93A damages arise from the same conduct that comprises the elements of A.R.M.S.' trade secrets claim, any separate award of damages would be improperly cumulative.  See Calimlim v. Foreign Car Ctr., Inc., 392 Mass. 228, 235-36, 467 N.E.2d 443, 447-48 (1984).  Thus A.R.M.S.' total damage award is $1,813,465.  However, A.R.M.S. is also entitled to its reasonable attorneys' fees, expenses, and costs, including expert fees. Mass. Gen. Laws ch. 93A, § 11; Maillet v. ATF-Davidson Co., 407 Mass. 185, 194-95, 552 N.E.2d 95, 100-01 (1990); see also Wyler v. Bonnell Motors, Inc., 624 N.E.2d 116, 119 (Mass. App. Ct. 1993) (awarding legal fees and costs but not cumulative 93A

damages); <u>Incase</u>, 421 F. Supp. 2d at 242-45 (not awarding 93A damages as duplicative, but awarding attorneys' fees and costs).

Finally, A.R.M.S. has moved the Court to enjoin permanently Troy from using the trade secrets at issue in this case.  An injunction is not appropriate in this case, however, as A.R.M.S. has publicly marketed products that incorporate its trade secrets, which can be reverse engineered, and numerous other manufacturers currently market the same or similar technology. Where "the plaintiff's product, including the trade secret, has been marketed," Massachusetts courts often look to the "head start rule," crafting injunctions to prevent defendants from receiving an unfair head start in competing with the plaintiff's product.  <u>Jet Spray Cooler, Inc. v. Crampton</u>, 377 Mass. 159, 171 n.11, 385 N.E.2d 1349, 1357 n.11 (1979).  The head start rule follows from the fact that "[t]he marketing of the product gives competitors a legitimate opportunity to study the product and to learn the principles of the trade secret through reverse engineering or similar procedures."  <u>Id.</u>  As such, "the time necessary to engineer in reverse is one factor to be considered in determining . . . the [appropriate] duration of injunctive relief."  <u>Id.</u>  Also relevant is "evidence that other manufacturers have been able to design and produce devices nearly identical to" the product that incorporates the trade secret. <u>Analogic Corp. v. Data Translation, Inc.</u>, 371 Mass. 643, 648, 358 N.E.2d 804, 808 (1976).  These considerations insure that the

-19-

defendant cannot benefit from an ill-gotten "head start," but is not enjoined longer than necessary.

"The scope of an injunction depends on a comparative appraisal of all of the facts of the case, and what is reasonable will depend in each instance on the particular facts." Jillian's Billiard Club, 619 N.E.2d at 638.  In Jillian's Billiard Club, the court found it instructive to look to the Restatement of Unfair Competition:

> If the trade secret has already entered the public domain, an injunction may be appropriate to remedy any head start or other unfair advantage acquired by the defendant as a result of the appropriation.  If the defendant retains no unfair advantage from the appropriation, an injunction against the use of information that is no longer secret can be justified only on a rationale of punishment and deterrence. However, because of the public interest in promoting competition, punitive injunctions are ordinarily inappropriate in trade secret actions.

Id. at 638-39 (quoting Restatement (Third) of Unfair Competition § 44(2) cmt. c (Tentative Draft No. 4, 1993)).  In this case, A.R.M.S. has marketed the relevant product for a significant period of time.  The product makes the trade secret evident. Other manufacturers have been able to produce and market nearly identical products.  At this point, Troy has no competitive advantage.  Considering the facts of the case, no injunction is warranted.[1]

---

[1]  The result is the same following the traditional test for entry of a permanent injunction that requires the court to find that "(1) plaintiffs prevail on the merits; (2) plaintiffs would suffer irreparable injury in the absence of injunctive relief;

**ORDER**

In sum, the Court finds for the Plaintiff on its Chapter 93A claim (Count V), but awards the Plaintiff only reasonable attorneys' fees, expenses, and costs, including expert fees.

/s/PATTI B. SARIS
Patti B. Saris
United States District Judge

---

(3) the harm to plaintiffs would outweigh the harm the defendant would suffer from the imposition of an injunction; and (4) the public interest would not be adversely affected by an injunction." A.W. Chesterton Co. v. Chesterton, 128 F.3d 1, 5 (1st Cir. 1997).  Here, because the product incorporating the trade secret has been marketed and A.R.M.S. is receiving damages, A.R.M.S. would not suffer irreparable injury.  Further, because the product has been marketed and there is significant competition, the harm to A.R.M.S. would not outweigh the harm to Troy.  Finally, given those circumstances, the public interest in promoting competition weighs against granting an injunction.