IN THE UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| ATLANTIC RESEARCH MARKETING SYSTEMS, INC.,<br><br>Plaintiff,<br>v.<br><br>STEPHEN P. TROY, JR. AND TROY INDUSTRIES, INC.,<br><br>Defendants. | Civil Action No. 07-cv-11576 (PBS) |

**MEMORANDUM OF LAW IN SUPPORT OF MOTION OF DEFENDANTS TO COMPEL PRODUCTION OF DOCUMENTS**

The defendants, Stephen P. Troy, Jr. and Troy Industries, Inc. (collectively "Troy"), hereby move that the Court to compel plaintiff, Atlantic Research Marketing Systems, Inc. ("A.R.M.S."), to produce the following documents because they constitute newly discovered evidence, which by due diligence Troy could not have discovered in time to move for a new trial under Rule 59(b), and the withholding of which substantially interfered with Troy's ability to fully and fairly prepare for and proceed at trial.

**INTRODUCTION**

Troy discovered that the bills A.R.M.S. recently submitted for compensation under c. 93A contain time entries showing that A.R.M.S. failed to produce several key documents. A.R.M.S. never disclosed their existence at any point during this lengthy litigation despite applicable discovery requests. Rather, A.R.M.S. appears to have inadvertently disclosed them in attaching the billing records to its fee application. They are:

1. Affidavit of Martin Barreras referenced in the redacted August 15, 2007 bill and in the September 18, 2007 bill of Iandiora & Teska; August 2007 is the month and year A.R.M.S. filed this suit. See Exh. A;

1

2.  A Joint Defense Agreement between A.R.M.S. and Samson referenced in the December 31, 2007 bill of Duffy, Sweeney & Scott and in the September 18, 2007 bill of Iandiorio & Teska. See Exh. A;

3.  A Common Interest Agreement between A.R.M.S. and Samson referenced in the redacted October 11, 2007 bill of Barlow, Jospehs & Holmes and in the September 18, 2007 bill of Iandiorio & Teska. See Exh. A; and

4.  A report(s) of analysis on the Troy laptop returned to A.R.M.S. prepared by Stroz Friedberg conducted over a seven month period in 2008, referenced in numerous time entries in the redacted bills of attorneys Scott, Bush and Holmes, and those of forensic expert, Stroz Friedberg, which exceed $15,000. See Exh. B.

Production of these withheld documents is expected to support a motion for relief from judgment under Rule 60(b)(2) on the basis of newly discovered evidence and/or under Rule 60(b)(3) for misconduct. Under Rule 60(b)(2), newly discovered evidence is "evidence of facts in existence at the time of trial which the aggrieved party was excusably ignorant." *Kettenbach v. Demoulas,* 901 F.Supp. 486, 493 (D. Mass. 1995) *quoting Rivera v. M/T Fosarina,* 840 F.2d 152, 156 (1st Cir. 1988)[1]. Under Rule 60(b)(3) the question is whether the challenged conduct "substantially [] interfered with the aggrieved party's ability to prepare for and proceed at trial." *Anderson v. Cryovac,* 862 F.2d 910, 924 (1st Cir. 1988). A Rule 60(b)(3) motion must show that the missing evidence would likely have changed the outcome of the trial, while a Rule 60(b)(2) motion is not so stringent, and is merely "aimed at correcting erroneous judgments stemming from the unavailability of evidence." *Id.,* n.10.

Neither question can be affirmatively answered in the absence of the documents. By withholding them, Troy contends that A.R.M.S. substantially interfered with its

---

[1] The elements to obtain a new trial for newly discovered evidence are: "(1) The evidence has been discovered since the trial, (2) The evidence could not by due diligence have been discovered earlier by the movant; (3) The evidence is not merely cumulative or impeaching; and (4) The evidence is of such nature that it would probably change the result if a new trial is granted." *Kettenbach,* 901 F.Supp. at 493.

ability to present its defense. The critical issue before the jury was whether it believed Troy misappropriated trade secrets of A.R.M.S. in the design of a prototype of a handguard. Since there were no design documents or any drawings of the handguard, the jury relied solely on testimony. A.R.M.S. testified that it showed Mr. Troy the handguard when he was an A.R.M.S. employee, and Troy testified that he independently developed his own version of a handguard.

Credibility of the parties was crucial to the jury's consideration. A.R.M.S. argued to the jury that Troy withheld the "Smith & Wesson" documents and that Troy deleted documents from the laptop that he returned to A.R.M.S. after he was terminated. However, A.R.M.S. withheld from the jury documents that (1) bore on the nature and description of the alleged A.R.M.S. prototype and (2) on the credibility of the parties.

### 1. The Barreras Affidavit

According to the billing records of A.R.M.S.' first counsel, A.R.M.S. prepared the Barreras Affidavit in August of 2007, the same month that A.R.M.S. filed this suit against Troy. Barreras is the only non-party witness to the creation of the prototype handguard. The Barreras affidavit is responsive to at least numbers 1, 9, 12 and 47 of Troy's document request. See Exh. C.

**Document Request Number 1** asked for:

> All documents and things reviewed, read, consulted relied on used or considered in responding to Troy's First Set of Interrogatories to A.R.M.S..

In answer to Interrogatory number 2, A.R.M.S. claimed that "It is believed that Mr. Barreras has information concerning the conception of the claimed invention and testing of prototypes." See Exh. D. Consequently, A.R.M.S. "relied on, used or

3

considered" the Barreras Affidavit in "responding to Troy's First Set of Interrogatories to A.R.M.S." and therefore A.R.M.S. should have produced it response to Document Request Number 1.

**Document Request Number 9** asked for:

All documents and things concerning the first **conception** and first reduction to practice in the United States of the alleged invention recited in each of the claims of the '245 and/or '465 patents. (emphasis added).

Since A.R.M.S. identified Barreras in interrogatories as having "information concerning the "**conception**" of the claimed invention and testing of prototypes", A.R.M.S. should have produced his Affidavit in response to Document Request Number 9. See Exh. C and Exh. D.

**Document Request Number 12** asked for:

All documents and things concerning all publications, **prior disclosures**, oral or written, of the alleged invention recited in each of the claims of the '465 patent prior to the filing dates of the applications that matured into the'245 and/or '465 patents and all applications from which these patents claim priority. (emphasis added).

Since A.R.M.S. identified Barreras in interrogatories as having "information concerning the conception of the claimed invention and testing of prototypes", his Affidavit concerning "**prior disclosures**" of the prototype and A.R.M.S. should have produced in response to Document Request Number 12. See Exh. C and Exh. D.

**Document Request Number 47** asked for:

All documents and things concerning A.R.M.S.' **decision to file suit against** Defendants for allegedly infringing the'245 and/or '465 patent. (emphasis added).

Since A.R.M.S. prepared the Barreras Affidavit at the time A.R.M.S. filed suit and the affidavit was a document that concerned A.R.M.S.' **decision to file suit** against

4

Troy, A.R.M.S. should have produced it in response to Document Request Number 47. See Exh. C.

The Barreras affidavit likely either contradicts his trial testimony, or reaffirms that the prototype was a 2-point attachment system. The Troy handguard is a single point attachment system. Since there was no other witness to the creation of the prototype handguard, there is a strong likelihood that the jury would have reached a different result had the jury disbelieved the testimony of the only non-party witness to the creation of the prototype. Even if the jury would not have reached a different conclusion, the withholding of the affidavit substantially interfered with Troy's ability to prepare its defense.

### 2. The Joint Defense Agreement and The Common Interest Agreement

A.R.M.S. failed to produce a Joint Defense Agreement between A.R.M.S. and Samson referenced in the December 31, 2007 Scott/Bush bills and in the September 18, 2007 bill of Iandiorio & Teska. A.R.M.S. also failed to produce a Common Interest Agreement between A.R.M.S. and Samson referenced in the October 11, 2007 bill of Barlow, Josephs & Holmes and in the September 18, 2007 bill of Iandiorio & Teska. Both Agreements are responsive to at least document requests numbers 6, 10, 25, 27 of Troy's Document request. See Exh. C.

**Document Request Number 6** asked for:

> All documents and things concerning any communications between A.R.M.S. and any person relating to the '465 patent and applications from which the patent claims priority.

Since A.R.M.S. engaged in a Joint Defense Agreement and a Common Interest Agreement over this litigation, and also since A.R.M.S. engaged in communications with

a person "relating to the '465 patent", A.R.M.S. should have produced the two Agreements. See Exh. C.

**Document Request Number 25** asked for:

All confidentiality agreements concerning the alleged invention recited in any claim of the '245 and/or '465 patents.

A Joint Defense Agreement and a Common Interest Agreement is a "confidentiality agreement". A.R.M.S. should have produced it in response to this document request. If A.R.M.S. had actually produced the two agreements as called for, then Troy would assuredly have taken Samson's deposition, which would have led to the discovery of admissible evidence.

### 3. The Stroz Friedberg Reports

In 2008, either A.R.M.S. or its counsel engaged a forensic computer firm by the name of Stroz Friedberg to perform an analysis of the laptop that Stephen Troy returned to A.R.M.S. after A.R.M.S. terminated his employment in 2003. Stroz Friedberg performed its work five years after Troy returned the laptop. A.R.M.S. failed to produce the reports and results of the Stroz Freidberg analysis. The documents Stroz Friedberg obtained in its forensic results are responsive to Troy document requests numbers 40, 41, 81 and 90, and to Troy interrogatory numbers 2 and 13.

**Interrogatory number 2** asked A.R.M.S. to:

Provide the name, address, telephone number, place of employment, and job title of any person who has, claims to have, or whom you believe may have **knowledge or information pertaining to any fact alleged in the pleadings** filed in the action, any fact underlying the subject matter of this action, or any counterclaim filed in this action, and state the specific nature and substantive of the knowledge that you believe each such person may have.

See Exh. D. Stroz Friedberg had "**knowledge or information pertaining to any fact alleged in the pleadings**", but A.R.M.S. failed to identify Stroz Friedberg in answer to this (or any other) interrogatory, or in A.R.M.S.' initial disclosure under Rule 26(a). See Exh. D and Exh. E.

> **Interrogatory number 13** asked A.R.M.S. to:
>
> State the basis for the allegations in paragraphs 56 to 61 of Plaintiff's Complaint that the Defendants have converted property of A.R.M.S. for their own use, including but not limited to: (a) identify all property alleged by A.R.M.S. to have been converted, including whether such property constitutes real or tangible property or intellectual property; and (b) state the basis for the assertion that he did so deliberately, willfully and wantonly.

In response, A.R.M.S. merely stated that "defendants converted A.R.M.S.'s computerized information" and "reserve[d] the right to supplement this Interrogatory", A.R.M.S. but failed to supplement that Interrogatory.  A.R.M.S. should have described the Stroz Friedberg work in answer to this interrogatory. A.R.M.S. failed to so describe Stoz Friedberg. See Exh. D.

> **Document Request Number 40** sought:
>
> All documents and things which have been shown or provided in connection with this lawsuit to any actual or **potential fact** or **expert witness** who is not a current employee of A.R.M.S..

See Exh. C. Stroz Friedberg was a **potential fact** *and* **expert** witness. Christine Bush recorded two time entries in which she appears to reference Stroz Friedberg as an "expert". In a May 19, 2008 entry, she recorded "correspondence with forensic expert". In a June 20, 2008, entry she recorded "correspond with expert".  Mr. Holmes also referenced Stroz Friedberg as a "forensic computer expert" in a June 9, 2008 billing entry. See Exh. B.

7

**Document Request Number 41** sought:

All documents and things which A.R.M.S. **intends to rely on** to prove or disprove any claim, counterclaim or defense in this litigation.

A.R.M.S. relied on the Stroz Friedberg analysis but it withheld the analysis from Troy. See Exh. B

**Document Request Number 81** sought:

All documents and things that A.R.M.S. **intends to use** at any trial, in this action.

A.R.M.S. used the substance of the Stroz Friedberg analysis at trial but withheld the Stroz Friedberg documents from Troy. A.R.M.S. excluded these documents from its privilege log produced on September 25, 2008.[2] See Exh. F

At trial, contrary to the Stroz Freidberg reports, Richard Swan testified on direct examination by A.R.M.S.' counsel that Swan "discovered that all the information on it [laptop] had been deleted." See Trial Tr. vol. 2 at 65, Exh. G. His trial testimony was as follows:

Q:   After Mr. Troy received that letter [demanding return of A.R.M.S. property] did he return all of A.R.M.S.' property?

A:   No.

Q:   What didn't he return?

A:   The thing that stands out in my mind is a laptop computer that had an awful lot of information on it.

Q:   Did you ever get the laptop back?

A:   Eventually.

Q:   What did you do upon its receipt?

---

[2] The log appears to be dated July 23, 2008.

8

> A: We got it back six or seven months later, to the best of my recollection, and discovered that all the information had been deleted.
>
> Q: Mr. Swan, is it A.R.M.S.'s contention in this case that Mr. Troy engaged in misconduct?
>
> A: He certainly did engage in misconduct.
>
> * * *
>
> Q: Can you provide any specific examples to the ladies and gentlemen of the jury of Mr. Troy's misconduct shortly after he was terminated by A.R.M.S.?
>
> A: Eliminating all the things on the computer. . . .

See Trial Tr. vol. 2 at 65-66, Exh. G.

It was overly and unfairly prejudicial to Troy for the jury to hear that Troy deleted all of the documents on the laptop but not see the contrary documentary evidence. On cross examination, Mr. Swan alluded to a forensic report but claimed that he never received a copy of a report:

> Q: Did you have a forensic consultant take a look at your laptop?
>
> A: Yes, they did.
>
> Q: And do you have a report of that forensic consultant?
>
> A: I don't have a copy of that report.
>
> Q: Did you ever have a copy of that report?
>
> A: No. I was told what was on it.
>
> Q: And what was on it?
>
> A: I was told somebody purposely went and pretty much destroyed everything on the computer.

Q: But you haven't given that report to anybody in this litigation, have you?

A: I never had the report. I was just told verbally.

See Trial Tr. vol. 2 at 105-06, Exh. G.

Since Mr. Swan claimed he never had such a report, there was no basis on which to seek a continuance at trial to obtain any further discovery. See e.g., *United States Fidelity & Guaranty Co. v. Baker Material Handling Corporation,* 62 F.3d 24, 28-9 (1st Cir. 1995) (appropriate remedy is to seek a trial continuance instead of seeking a new trial).[3]

A.R.M.S. cross-examined Troy on the laptop and insinuated that Troy used it to prepare a confidential memorandum on A.R.M.S.' products:

Q: A.R.M.S. provided you with a laptop computer, did they not?

A: They did. A brand-new laptop.

Q: And that was for your use as an A.R.M.S. employee?

A: Yes.

Q: And you took that laptop with you on those business trips?

A: Most of them, yes.

Q: And one of the trips you took was to Crane [Naval base], correct?

A: Yes.

\*\*\*

Q: And you prepared a memorandum of that visit?

A: I did.

---

[3] "In any event, failure to pursue discovery to the utmost limit does not preclude a successful Rule 60(b)(2) motion." *Kettenbach,* 901 F.Supp. at 495.

Q: And in that memorandum, you described A.R.M.S.' products as far superior to anything else on the marketplace today?

A: Correct.

\*\*\*

Q: And that's a September 18, 2002 laptop computer upgrade for MDNS [Crane] contract work?

A: Yeah. That's for Microsoft Office Suite. There was no word processing programs in a new computer.

See Trial Tr., vol. 6 at 31-33, Exh. G.

Q: And as part of this e-mail exchange, right where the highlighting is, you say, "I'm sorry for the delay, but I had valuable information stored that needed to be retrieved prior to shipping. And you're referring to the laptop computer?

A: Yes, ma'am.

*Id.* at 36.

In A.R.M.S.' closing argument A.R.M.S. twice brought up the laptop to argue that Troy used it to store valuable trade secrets of A.R.M.S.:

> A.R.M.S. presented Troy with a company laptop, introduced him to his customers, his contacts, development information, the manufacturing processes, Frank Basile, the Bay State organization, Lieutenant Colonel Crane – Lieutenant Colonel Taylor at Crane.

See Trial Tr., vol. 7 at 44, Exh. G.

\*\*\*

And we talked a little bit about Crane and the reasons why he didn't launch a 1999 proof of concept. Pretty astute why he didn't. A.R.M.S.' vendor and customer relationships. Those customer relationships resided on that laptop and the computer, the computer which contained confidential information. A.R.M.S. treated all of this as trade secrets and there's not any evidence to the contrary. There's none. It was not known

11

outside of A.R.M.S. except by members of the military and others who were subject to nondisclosure obligations.

See Trial Tr. vol. 7 at 47, Exh. G.

Contrary to Swan's trial testimony elicited by counsel on direct examination, Mr. Troy did not eliminate all the things on the computer. The Stroz Friedberg bills themselves state that "carved documents" and "emails" were printed. "Zip reports" were prepared. See Exh. B. A.R.M.S. never disclosed the existence of such carved documents, the emails, the zip files or any of the forensic results.[4]

A.R.M.S. used this damning testimony to support its claims that Mr. Troy breached his fiduciary duties, that he stole A.R.M.S.' trade secrets, and that he converted A.R.M.S.' property. This testimony was used to support far more than a mere conversion claim. A.R.M.S. claimed that this was evidence of "misconduct" to plant in the jury's mind that Stephen Troy stole A.R.M.S.' trade secret in the design of a handguard. A.R.M.S. did so while simultaneously withholding the very documents that appear to contradict this trial testimony.

There are no less than sixteen separate time entries in the billing records of three lawyers over a span of 5 months that reference the Stroz Friedberg forensic analysis, from February - July, 2008. For instance, on February 28, 2008, "CMS", presumably Craig M. Scott, recorded: "Telephone call to Stroz Friedberg regarding computer forensic issues." On April 4, 2008, Scott recorded: "telephone call from S. Holmes regarding forensic examination." On April 16, 2008, Scott recorded: "conference call with client and S. Berman of Stroz Friedberg." Scott recorded more work with Stroz Friedberg in

---

[4] A.R.M.S. seeks recovery of $15,553.75 for three Stroz Friedberg bills and an indeterminate amount of attorney time without ever having disclosed the retention of Stroz Freidberg and after introducing trial testimony that appears to flatly contradict the Stroz Friedberg results.

May and June. On June 10, 2008, Scott recorded: "conference call with S. Berman of Stroz; correspondence regarding same; telephone call to R. Swan regarding preliminary findings." On June 13, 2008, Scott recorded: "Review Stroz Friedberg forensic results." On July 23, 2008, "CB" (presumably Christine Bush) recorded: "Review Stroz Freidberg forensic results".

According to his bills, A.R.M.S.' patent prosecution counsel, Stephen Holmes, also reviewed the Stroz Friedberg reports and documents taken from the laptop. Mr. Holmes recorded a billing entry dated April 18, 2008, stating: "Receipt and review of email from Seth B.@ Strohs [sic]; locate, scan and forward relevant documents for forensic computer search." Mr. Holmes recorded an entry dated May 2, 2008: "Receipt and review of email from Seth Berman re Forensic Examination of computer; review of sample documents and forward to Craig with comments. .40 [hours]". He recorded another entry dated June 2, 2008: "Receipt and review of emails re transcripts, laptop docs . . ." On June 9, 2008, Mr. Holmes recorded: "Review of reports from forensic computer expert to identify documents of interest from Troy laptop. 2.2 [hours]". On June 10, 2008, Holmes recorded: "Finish keyword searches for laptop computer and compile documents of interest. 2.4 [hours]." On June 18, 2008, Mr. Holmes recorded: "Continued review of Samson deposition transcripts; Troy laptop data . . ." [5] See Exh. B.

The Stroz Friedberg bills themselves disclose the existence of documents found on the Troy laptop. An April 18, 2008 entry in a bill states: "Carve relevant selected emails from unallocated space." An April 21 entry states: "SPB Review documents extract from computer." A May 30, 2008 entry states: "generate reports by keyword. Zip

---

[5] These and many other billing entries undermine A.R.M.S.' fee application that Mr. Holmes was necessary to provide advice "in matters related to the interrelationship of Patent Law and Trade Secret Law", (Pl.'s Statement at 9).

reports and email to S. Berman." On June 16, 2008, an entry recites: "Draft email to S. Holmes and C. Scott regarding final carved documents; review final carved documents; conference with P. Perry regarding final carved documents." See Exh. B.

From these entries it is unclear which documents Stroz Friedberg forensically recovered and which documents were simply printed from the laptop. But one thing is clear, A.R.M.S.' forensic computer expert recovered not a single document that could be considered a trade secret document, or A.R.M.S. would undoubtedly have introduced such a document at trial to support its trade secret claim and 93A claim against Troy.

Withholding the Stroz Friedberg analysis and reports constitutes clear prejudice. A.R.M.S. withheld the very documents that contradicted its claim that Troy deleted trade secret documents from the laptop. The Stroz Friedberg report would have also been subject to being discredited since the analysis of the laptop was performed in April – June of 2008, and Troy left the employ of A.R.M.S. in 2003. A forensic analysis of a computer performed 5-6 years after Stephen Troy's last use lacks credibility. A.R.M.S.' use of the forensic analysis at trial as a means to claim misconduct on the part of Troy, while refusing to produce it, prejudiced Troy. Such trial conduct also denied Troy due process rights since Troy was unable to cross examine the withheld report.

Swan's professed lack of knowledge of the reports offer A.R.M.S. no defense. The First Circuit stated that the district court should "correctly impute[] counsel's knowledge and behavior to the client." *Anderson v. Cryovac, Inc.*, 862 F.2d 910, 927 (1st Cir. 1988). If the jury had the benefit of these documents taken from the laptop, the jury likely would have taken a far different view of Stephen Troy and Troy Industries.

## Conclusion

Until Troy receives the withheld documents, Troy cannot assess the viability of a motion under Rule 60(b). However, given the description of the documents, Troy has established that these are newly discovered documents that in the exercise of due diligence Troy would not have known existed until A.R.M.S.' fee application. Troy has established a claim of misconduct, and that A.R.M.S. substantially interfered with Troy's ability to prepare for trial. Accordingly, Troy requests that the Court order the immediate production of all of the requested documents along with a certificate signed by A.R.M.S. and its counsel that the produced documents constitute the entirety of the withheld documents.

Respectfully submitted,

DONOVAN HATEM, LLP

/s/ Damian R. LaPlaca
Damian R. LaPlaca (BBO No. 55139)
dlaplaca@donovanhatem.com
Two Seaport Lane
Boston, MA 02210
Telephone:   (617) 406-4500
Facsimile:   (617) 406-4501

*Attorneys for Defendants, Troy Industries, Inc. and Stephen P. Troy*

Dated: October 15, 2010

LANDO & ANASTASI, LLP

/s/ Thomas P. McNulty
Thomas P. McNulty (BBO No. 654564)
tmcnulty@ll-a.com
Ann Lamport Hammitte (BBO No. 53263)
ahammitte@ll-a.com
Riverfront Office Park

One Main Street, 11th Floor
Cambridge, MA  02142
Telephone:     (617) 395-7000
Facsimile:     (617) 395-7070

## CERTIFICATE OF SERVICE

I hereby certify that a true copy of the foregoing ***Memorandum of Law in Support of Motion of Defendants to Compel Production of Documents*** was filed through the ECF system and will be sent electronically to the registered participants, including those persons listed below, this 15th day of October, 2010:

Paul J. Hayes, Esquire
Paul J. Cronin, Esquire
Mintz Levin Cohn Ferris Glovsky & Popeo, P.C.
One Financial Center
Boston, MA 02111

Thomas P. McNulty, Esquire
Ann Lamport Hammitte, Esquire
Lando & Anastasi, LLP
Riverfront Office Park
One Main Street, 11th Floor
Cambridge, MA  02142


/s/ Damian R. LaPlaca

01315385.DOC